2019 IL App (1st) 190467

SIXTH DIVISION
October 4, 2019

No. 1-19-0467

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* Je. A., E.A., and Ja. A., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 13 JA 790, 13 JA 791 & |
| v. | ) | 15 JA 795 |
| | ) | |
| Newgene A., | ) | |
| | ) | Honorable Andrea Buford, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justice Harris and Justice Delort concurred in the judgment.

**OPINION**

¶ 1     This is an expedited appeal that concerns the care and custody of minor children.

Respondent Newgene A. appeals from an order of the circuit court finding him unfit as a parent

as defined in sections 1(D)(b) and 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (m)

(West 2018)) and pursuant to section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29

(West 2018)) and terminating his parental rights to his minor children, Je. A., E.A., and Ja. A.

Respondent contends that the evidence failed to establish that he was unfit. For the reasons set

forth below, we affirm.

¶ 2                                    BACKGROUND

¶ 3    Respondent is the biological father of twin boys, Je. A. and E.A., born on August 9, 2013, and their younger brother Ja. A., born August 3, 2015. Janica M.[1] is the mother of all three boys.

¶ 4                          Background of the Case for Je. A. and E.A.

¶ 5    The twins were taken into temporary protective custody 12 days after their birth on August 21, 2013, based on allegations of abuse and neglect. On August 23, 2013, the State filed a petition for adjudication of wardship, alleging that their environment was injurious to their welfare and that they were at a substantial risk of physical injury. The petition reflected that Janica M. had three other minor children that were in the custody of the Department of Children and Family Services (DCFS). Janica M. had been inconsistent with services, including attending substance abuse support group meetings, random urine drops, and individual therapy. The petition also stated that she and respondent needed to complete psychological evaluations. Additionally, respondent was in need of services, including therapy. The affidavit supporting the State's petition stated that respondent was convicted of murder and served 35 years in prison. Respondent was asked to complete individual and couples counseling but had not done so at the time the petition was filed. Janica M. and respondent lived with Janica M.'s mother, who also had a history of prior involvement with DCFS.

¶ 6    On August 23, 2013, a temporary custody hearing was held, and the court found that probable cause of abuse and neglect existed and there was an urgent and immediate need to remove the twins from their parents' home. The court based its finding on Janica M.'s history with DCFS, her failure to comply with services, and respondent's failure to follow-up on recommended services. At the time, respondent's paternity had not yet been established. Also on that date, the public guardian was appointed to represent the twins.

---

[1]Janica M. was defaulted by publication with regard to the termination proceedings on January 23, 2018. She is not a party to this appeal.

¶ 7      On October 22, 2013, the court entered paternity orders, finding that respondent was the twins' father. On May 22, 2014, the court held an adjudication hearing and found the twins neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) based on Janica M.'s extensive history with DCFS, substance misuse, and failure to complete services. Additionally, the order reflected that paternity had not been established[2] and that respondent required assessment and services.

¶ 8      On June 13, 2014, the court conducted a permanency planning hearing and set a permanency goal of return home within 12 months. The court's order reflected that Janica M. had made "some progress" towards the twins' return home, respondent had made substantial progress towards the twins' return home, but that respondent and Janica M. had not successfully completed reunification services. The twins were adjudicated wards of the court, and respondent was found "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor[s]."

¶ 9      On October 17, 2014, the court entered another permanency order with a goal of return home within 12 months, finding that "mother and father have made progress in services."

¶ 10      On April 17, 2015, the court entered an order setting the twins' permanency goal at return home within 12 months, finding that respondent had made substantial progress towards this goal and that the parents were engaged in reunification services and visitation. The order also stated that the twins were placed with nonrelative foster parents. On October 15, 2015, the court entered another permanency order with the goal of return home within 12 months. That order did not contain a finding about respondent's progress but stated that he and Janica M. were engaged in reunification services and visitation.

_____

[2]This appears to be an error because orders establishing paternity were entered on October 22, 2013.

3

¶ 11    On October 19, 2016, the court entered a permanency order that changed the twins' goal to substitute care pending a court determination on termination of parental rights. The order stated as follows: the twins are "three years old and placed together in a stable, preadoptive home. Mother's whereabouts are unknown. Father is incarcerated. Reunification services remain outstanding. Parent-child visitation has been inconsistent."

¶ 12                                Background of the Case for Ja. A.

¶ 13    Ja. A. was taken into temporary protective custody three days after his birth on August 6, 2015, based on allegations of abuse and neglect. On August 10, 2015, the State filed a petition for adjudication of wardship, alleging that his environment was injurious to his welfare and that he was at a substantial risk of physical injury. The petition stated that Janica M. had five other children that were in DCFS custody. In addition to the same allegations contained in the twins' petition, the State alleged that Janica M. had not attended support meetings since November 2014 and missed several urine drops since March 2015. The petition also stated that respondent needed to complete random urine drops and additional parent coaching and had been noncompliant with the urine drops. Respondent and Janica M. were then living together. Also on that date, the court held a temporary custody hearing and found that based on the allegations of the State's petition, probable cause existed that Ja. A. was abused or neglected, which supported his removal from the home. The public guardian was appointed to represent Ja. A.

¶ 14    On August 19, 2015, the court entered a temporary custody order, finding that probable cause existed that Ja. A. was neglected and that there was an immediate and urgent need to remove him from the home based on Janica M.'s history with DCFS and outstanding services. The order also stated that respondent's paternity had not yet been established and that he had outstanding drops. Also on that date, respondent was granted supervised day visitation with Ja.

A. of eight hours per week. On October 15, 2015, the court entered a paternity order, finding that respondent was Ja. A.'s father.

¶ 15    On January 21, 2016, the court entered an adjudication order for Ja. A., finding that he was abused or neglected based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2014)) and substantial risk/physical injury (*id.* § 2-3(2)(ii)). The order stated that the parents had prior DCFS involvement, Janica M. had a history of substance misuse and had not completed recommended services, and that the parents resided together.

¶ 16    On January 11, 2017, the court adjudicated Ja. A. a ward of the court, finding that both respondent and Janica M. were "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor." The order reflected that services aimed at family preservation and reunification had been unsuccessful.

¶ 17    On March 9, 2017, the court entered a permanency order with a goal of substitute care pending court determination of termination of parental rights. The order reflected that Ja. A. was one-and-a-half years old and in a two-parent foster home. Respondent was incarcerated and Janica M. had not visited Ja. A.

¶ 18                          Termination Proceedings

¶ 19    The State filed motions for the appointment of a guardian with the right to consent to adoption for the twins on January 30, 2017, and on July 21, 2017, for Ja. A. (collectively, termination petitions). The termination petitions listed respondent's address as Danville Correctional Center. The termination petitions alleged that respondent was unfit to parent under section 1(D)(b) of the Adoption Act (failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare) and section 1(D)(m) of the Adoption Act (failure to make reasonable efforts to correct the conditions which were the basis of removal of the children

and/or failure to make reasonable progress toward return of the children within any nine-month period). On April 24, 2018, the State filed its pleading specifying the nine-month time periods for progress for the twins as May 22, 2014, through February 22, 2015; February 23, 2015, through November 23, 2015; November 24, 2015, through August 24, 2016; and January 19, 2016, through October 19, 2016. The State also specified the nine-month time periods for progress for Ja. A. as January 21, 2016, through October 21, 2016, and June 9, 2016, through March 9, 2017.

¶ 20                               Unfitness Hearing

¶ 21    On May 16, 2018, the court began respondent's unfitness hearing as to all three minor children. The court ultimately entered an order terminating Janica M.'s parental rights as a result of default through publication on January 23, 2018. Also on that date, the State filed an amended pleading specifying a single nine-month time period for progress as January 19, 2016, through October 19, 2016, for the twins and June 9, 2016, through March 9, 2017, for Ja. A.

¶ 22    The State called respondent to testify. Respondent testified that from September 2016 through September 2017, he was incarcerated at Danville Correctional Center. Respondent explained that he was incarcerated for failing to register as a murderer, which he was required to do for 10 years. Respondent stated that he had registered for three years, but after his kids were born and DCFS got involved, the situation became very stressful. He also stated that registering had "slip[ped] [his] mind" because he was "most focused on [his] kids being in DCFS" and that he was "going through a lot of stuff with their mother." Respondent testified that while incarcerated he requested visits with his children. He stated that visits were going to be set up but ultimately were not because:

"What happened, I had to go in the visiting room to fill out some papers, and they were saying, [y]ou can't hold your kids. They got to be on this side of the table. The kids cannot get up and then act, and I thought *** that would be unjust because they [are] little boys because little boys, and they gonna run around, so that would cause problems between me and them."

Respondent testified that, while in prison, he completed a parenting class in May 2017. Respondent has not been incarcerated since September 2017.

¶ 23    The State next called Ava de Groh, a caseworker from Lutheran Social Services of Illinois (LSSI or agency), who had been assigned to this case on December 28, 2015. At that time, the permanency goal for the three boys was return home within 12 months.

¶ 24    Regarding Janica M., de Groh testified that prior to reunification, she needed to complete anger management and Narcotics Anonymous/Alcoholics Anonymous (NA/AA) and that because she was inconsistent with her sessions, de Groh never found any satisfactory ratings for the mother. Janica M. was only rated satisfactory in parenting coaching, and that was due to the fact that parenting coaching was done at Janica M.'s home during visits. De Groh testified that she did not recommend unsupervised visits with the mother because she failed to complete anger management and NA/AA and still had a continued recommendation of parenting coaching. She also testified that the permanency goal for the twins was changed to termination of parental rights because Janica M. was inconsistent with her visits, discharged unsuccessfully from NA/AA and anger management, and still needed a parenting coach. The mother was found unsatisfactory for visitation because she did not attend a majority of the visits with Ja. A. De Groh testified that the eventual change in permanency goal to termination of parental rights

for Ja. A. was largely on the same basis as the twins. De Groh was unable to get in contact with the mother after October or November 2016.

¶ 25    De Groh then turned her testimony to respondent. She stated that as of January 2016, respondent only needed parenting coaching prior to the children being able to return home. She stated that she would have ranked respondent as satisfactory for parenting coaching from January through April 2016 because the services were conducted in his home during visits and that, in May 2016, LSSI was still recommending a goal of return home within 12 months for the children. De Groh explained that the rating would have changed after May 2016 for two reasons—the parenting coach abruptly left the agency and respondent was incarcerated in September 2016, which was when the new parenting coach began work at the agency. De Groh testified that respondent's visits were always supervised and there was never a recommendation for unsupervised visits with all three children. When given the choice, respondent selected supervised visits within the agency "so that way if there was any concerns or issues or if there was any signs of distress, he would have support of our agency or another caseworker with him." During 2016, both mother and respondent informed de Groh they were seeking reunification with one another, which was significant because parenting coaching was combined as a result of their desire to co-parent.

¶ 26    When asked why LSSI recommended a goal change to termination of parental rights for the twins in October 2016, de Groh responded that it was based on respondent's incarceration and his failure to complete parenting coaching. In July 2016, respondent informed de Groh that he was no longer seeking reunification with Janica M. As a result, respondent needed to be reassessed for all services as a single parent. De Groh testified that near the time of respondent's incarceration she was able to speak with respondent regarding the necessary services and

informed him that he would need to complete a substance abuse assessment and a mental health assessment, engage in individual therapy, and complete parenting coaching and parent education. When recommending the goal change to termination, the agency considered the length of time the children had been in custody because the twins had been in DCFS care since August 2013 and Ja. A. had been in DCFS care since August 2015. De Groh testified that respondent sent a letter to her supervisor while incarcerated asking about visits with the children and his status regarding services.

¶ 27    De Groh testified that the agency recommended a change in permanency goal to termination of parental rights for Ja. A. in March 2017 based on respondent's inconsistencies prior to incarceration, the incarceration itself, and that services were still needed. Respondent called de Groh in September 2017 to inform her that he was out of prison and asked when visits would start. De Groh stated that from the time she became the family's caseworker in 2015, respondent never sent her any items of value, cards, gifts or similar items, or letters for the children.

¶ 28    On cross-examination, De Groh testified that respondent had parenting coaching through LSSI from May 2014 through March 2016. There were concerns about respondent's ability to meet the three children's needs alone if he was not with Janica M. De Groh elaborated on a visit she observed during which Janica M. was sick and respondent was trying to "keep up" and play with all three children, while also trying to address Ja. A.'s needs, because he was still a baby at that point. Respondent had a difficult time getting the children to comply with what he was asking, getting them to take a nap, and making sure they were playing safely and appropriately. Specifically, when the twins were supposed to take a nap, respondent "would just place the twins on the bed, put a blanket on them and leave the room." The twins would then get up and run

around. De Groh testified that she met with respondent on October 13, 2017, informed him that he needed a mental health assessment and a substance abuse assessment, and provided him a list of community providers that could do those assessments. LSSI does not pay for services once the goal is changed to termination of parental rights. Although respondent informed de Groh that he scheduled an appointment for an intake assessment, she was never able to verify that he actually made the appointment. Respondent never informed her that he completed either assessment.

¶ 29   De Groh testified that from December 2015 until August 2016, the same visitation plan was in place—one visit per week with all three children in the parents' home and one visit per week with only Ja. A. at the agency. During the visit when Janica M. was ill and respondent was primarily responsible for caring for all three boys, de Groh described him as "exhausted" after the visit. Respondent and Janica M. did not consistently attend the weekly visit with Ja. A. at the agency. Specifically, respondent only attended one or two visits per month with Ja. A. during the aforementioned nine-month period. Between August 2016 and November 2017, respondent did not visit with the children. De Groh testified that during one of the visits with respondent, she was concerned because she observed respondent give chicken wings with bones in them—a choking hazard—to the twins, who were then around three years old. However, she also observed respondent feed Ja. A. with appropriate foods and change diapers. De Groh stated that when she prompted respondent with suggestions, he followed her advice. Since he was released from prison, respondent visited with the children five times but did not bring little gifts or food for the children during any visits. The children's foster parents were also present during these visits. During those five visits, although all three children were present, respondent was more engaged with Ja. A. De Groh testified that at the time of her testimony she would not recommend unsupervised visits between respondent and the three boys because she observed Ja. A. being

10

very standoffish with respondent and would not look at him. The twins were also resistant to interacting with respondent.

¶ 30    De Groh stated that in August 2016, when respondent informed her that he was no longer with Janica M., she recommended all services for him as single parent, which included parent coaching, a substance abuse assessment, mental health assessment and individual therapy, and parent education. De Groh testified that the parenting goal was changed one month after respondent became incarcerated, when de Groh learned that respondent would not be discharged from prison until September 2018, though he was actually discharged in September 2017. De Groh stated that her agency recommended that the three boys not visit respondent while he was incarcerated because it could be a "stressor" for them. She further testified that respondent contacted her when he was released from prison in September 2017, but the first visit was not until November 2017.

¶ 31    The State rested after calling respondent and de Groh as witnesses and introducing 10 client services plans and 2 integrated assessments (IAs)[3] into evidence. Family service plans are prepared every six months. Further, de Groh explained that an IA is a very thorough assessment prepared by a clinician that contains information regarding the parents' social history and provides other background. She used the IAs as resources in preparing service plans.

¶ 32    The 10 DCFS family service plans admitted by the State reflected the following:

> (1) DCFS family service plan, dated October 14, 2013, containing little reference to respondent but stating that respondent and Janica M. had agreed to engage in couples' therapy. At the time this plan was created, respondent was not yet established as the twins' biological father.

---

[3]The two IAs were admitted into evidence for the sole purpose of establishing a basis upon which de Groh generated subsequent service plans.

(2) DCFS family service plan, dated January 13, 2014, stating that the caseworker who prepared the plan had had numerous contacts with respondent over the prior 18 months. The following service recommendations were made for respondent: substance abuse assessment, therapy/couples' therapy, parenting coaching, visitation twice a week, safety, and a monthly home visit.

(3) DCFS family service plan, dated July 30, 2014, reflecting a permanency goal for the twins as return home within 12 months. In the summary of the family's progress since the last review, the plan stated that respondent had consistently engaged in substance abuse services, random urine drops, individual therapy, parenting coaching, and parent-child visitation. Respondent was successfully discharged from parenting coaching in March 2014. At that time, respondent and Janica M. were allowed unsupervised visits for one hour per week and supervised visits for four hours per week.

(4) DCFS family service plan, dated January 14, 2015, containing the same progress for respondent as the previous report, with the added notation that respondent had been recently discharged from weekly therapy.

(5) DCFS family service plan, dated August 10, 2015, containing the same progress for respondent as the previous report.

(6) DCFS family service plan, dated January 9, 2016, reflecting that the assessment completed after Ja. A.'s birth (in August 2015) recommended that respondent again attend individual therapy through parenting coaching. Respondent was then participating in parenting coaching again with LSSI. The plan noted that respondent had made satisfactory progress in attending parenting coaching services but unsatisfactory progress in following recommendations therefrom. Respondent was also noted to have

made unsatisfactory progress in demonstrating his parenting skills during visits. The plan noted that although respondent was discharged from parenting coaching in May 2014, parenting coaching was recommended again a year later.

(7) DCFS family service plan, dated July 27, 2016, stating that respondent had been arrested in April 2016 due to a failure to report the location of his residence, went to bond court in April and May 2016, and self-reported being incarcerated on August 26, 2016. The plan stated that respondent was being sentenced to two years' imprisonment. The plan noted that visits with Ja. A. that were scheduled for Wednesdays were occasionally cancelled or missed.

(8) DCFS family service plan, dated October 26, 2016, reflecting respondent's incarceration and containing no updates regarding respondent's progress. However, the plan reflected that the permanency goal was changed by the court on October 19, 2016, to termination of parental rights because "[b]iological parents did not comply with services."

(9) DCFS family service plan, dated January 26, 2017, reflecting respondent's incarceration and stating that although respondent self-reported his incarceration on August 26, 2016, he did not turn himself in until September 29, 2016. Further, "LSSI clinically staffed visitation for [respondent] in November 2016, and found visits were inappropriate at this time for all the minors."

(10) DCFS family service plan, dated June 30, 2017, stating respondent's prison discharge date was September 17, 2018. The plan was also updated to reflect that "[w]hen [respondent] is released he will have to be reassessed for services as a single parent."

¶ 33    Respondent did not present any witnesses but offered 19 exhibits into evidence, which the court allowed. Respondent then rested. Respondent's respectively numbered 19 exhibits consisted of the following:

(1) Certificate of completion of intensive outpatient treatment, dated February 28, 2011, issued by Healthcare Alternative Systems, Inc.

(2) Certificate of completion of "Life Skills II," dated March 4, 2011.

(3) Certificate of completion for anger management, dated March 30, 2011, issued by the St. Leonard's House and Adler School of Professional Psychology Anger Management Group.

(4) Certificate of completion for anger management, dated April 6, 2011, issued by the St. Leonard's House and Adler School of Professional Psychology Parenting Group.

(5) Certificate of completion, undated, for 16-week training of the diversified behavioral comprehensive care and management planning institute relationship workshop.

(6) Certificate of completion of 8-week strategic networking workshop, dated July 11, 2011, issued by St. Leonard's House.

(7) Certification of completion for job readiness training program, dated December 2 to 6, 2013, issued by Safer Foundation.

(8) LSSI mental health assessment form, dated December 23, 2013, stating that respondent was referred for service due to involvement with DCFS. Respondent was diagnosed with a "partner relational problem." The assessment also stated, *inter alia*, that respondent was experiencing difficulty with the mother of his children and that he had

trouble falling asleep at night due to worrying about his children. Further, respondent reported feeling frustrated because of his limited involvement in his children's lives and feeling angered because he was not in a position to raise his children. The assessment reflected that respondent experienced issues and symptoms related to being separated from his children.

(9) LSSI parent coach progress report, dated April 8, 2014, and covering the period of December 10, 2013, through April 8, 2014. The report reflected that respondent was referred because he "lacks effective parenting techniques and relies upon strategies learned from personal, family and childhood experiences." He also "lacks a knowledge base from which to perform appropriate parenting behaviors as the children get older and their needs become more complex." The report stated that respondent informed the clinician that he and Janica M. had been living together and continued their romantic relationship and co-parenting. Regarding the goal of developing positive parenting techniques, the report stated that no progress had been made and such a goal was unrealistic at that point. However, the report also stated that respondent displayed "elements of sound parenting, such as care, concern, attention and nurturing" and the ability to adequately provide for the basic needs of an infant.

(10) LSSI parenting coaching treatment plan, dated December 18, 2013, stating that respondent's goals were to identify developmental stages of the children and develop positive parenting techniques.

(11) LSSI discharge report, covering the period of December 9, 2013, to May 13, 2014, discharging respondent successfully from parenting coaching based on he and Janica M. co-parenting as a unit, and stating that "[i]f the couple decides not to cohabitate

15

or co-parent I would have concern about [respondent] as a single parent. Should this occur, it is my clinical recommendation that [respondent] have a psychological evaluation and a parenting capacity assessment."

(12) LSSI quarterly progress report, covering the period of May 26, 2014, to August 26, 2014, stating that respondent attended six individual therapy sessions and that progress "has improved." The report reflected that the therapist agreed that respondent's diagnosis of partner relational problems was accurate. Respondent had participated in counseling services since November 2013, was "compliant with services," and "made steady progress in counseling." The report concluded that "[respondent] appears to have developed the appropriate tools and skills necessary to communicate effectively, actively listen, and be attentive as a parent and partner in a romantic relationship."

(13) LSSI certificate, dated September 2, 2014, signed by two therapists.

(14) Cook County juvenile court clinic report, dated September 15, 2014, requested by the circuit court to obtain clinical information to assist in deciding on an appropriate permanency goal. At the time, the goal was to return home within 12 months. The report stated that respondent was convicted of murder when he was around 14 and sentenced to 35 years in prison. At the time of the report, respondent and Janica A. were still in a relationship. The report reflected that on August 19, 2014, during visitation with the children when a caseworker had to leave the room and respondent was left alone, he fell asleep, and the caseworker observed the twins playing with a fan and near a VCR when she returned. Respondent denied he fell asleep but may not have known that the caseworker took photos of him sleeping and allowed him to sleep for 10 minutes before waking him up. Additionally, the caseworker observed respondent feed the children

16

Vienna sausages, which were a choking hazard, and give them sugary soda. Another caseworker echoed those concerns by stating that although respondent was caring and appeared to love the twins, he never brought them appropriate food or drink. The report stated that up until that time, respondent appeared to be compliant with all services, including individual therapy, couples' therapy, parenting coaching, and this evaluation and visitation. Further parenting coaching was recommended as "[h]is discharge from parent coaching appears to have been premature." The report concluded that the likelihood of respondent achieving the goal of return home was "low to moderate" and that changing the goal to termination of parental rights would have a "minimal to nonexistent" impact on the twins.

(15) Counseling closing transfer summary, dated December 29, 2014, reflecting that respondent had completed individual therapy and couples' therapy.

(16) Letter from respondent to "Jennifer" at LSSI, dated December 20, 2016, stating, *inter alia*, "I also want to know why haven't I seen my kids yet? [W]hat is the problem. I want to see my kids. I'm their mother [and] father. They belong to me. Not you or anyone else."

(17) LSSI's letter in response to respondent's letter (written by de Groh), dated January 5, 2017, stating that prior to his incarceration, respondent was informed that he could send a letter to LSSI if he would like to know about the children and that the December 20, 2016, letter was the first letter de Groh had received. The letter informed respondent that the children were doing well and there had not been any concerns at that time. The letter also stated that the agency had found visits with respondent to be inappropriate "when taking into consideration the minors' ages, the distance they would

have to travel, and the inconsistencies in the prior parent-child visits." The letter further explained that "in order to do services at Danville Correction Center during your sentencing will have to be requested by you. *** You are still in need of parent coaching ***. You will need to request this services [*sic*] to your counselor in order to take part in them."

(18) DCFS family service plan, dated January 10, 2018, reflecting that respondent was still in need of parenting coaching. The plan reflected that respondent had self-reported being incarcerated on August 26, 2016, but did not turn himself in until September 29, 2016. Respondent was reassessed for services and needed to complete a substance abuse assessment, parenting coaching, and individual therapy. The plan stated that respondent was rated "Unsatisfactory Progress/Maintain Intervention" for safety, obtaining stable employment, attending parenting coaching, following recommendations from parenting coaching services, demonstrating parenting skills, attending individual therapy, following recommendations of therapist, and attending a substance abuse assessment. These factors were all evaluated when respondent restarted visitation on November 30, 2017, with the most recent prior visit having been on August 17, 2016. The plan noted that respondent had agreed with LSSI's determination that visits with him while in prison would have been inappropriate.

(19) Certificate of completion of "Inside Out Dads" parenting class, dated May 8, 2017, issued by Danville Correctional Center.

¶ 34    In closing argument, the State argued that respondent was incarcerated for one year due to his failure to register as a murderer and that Illinois law recognizes that a parent may be found unfit for failure to make reasonable progress if he commits a crime during any relevant nine-

month time period. Additionally, "glacial progress is not a demonstrable movement towards return home." The twins were adjudicated neglected in May 2014, and "two years of service is a long time for the children to have to wait for a parent to make demonstrable progress." The State emphasized de Groh's recommendation that respondent not have any unsupervised visits with the children and pointed out that the 19 exhibits submitted by respondent were primarily from outside the time period in question for a finding of unfitness under section 1(D)(m)(ii) of the Adoption Act. The public guardian's office adopted the argument of the State and pointed out some concerns it had with respondent's ability to parent as a single parent as evidenced by his own exhibits.

¶ 35    In closing, respondent argued that the State had failed to meet its burden because the 19 exhibits showed that respondent maintained a reasonable degree of interest, concern, or responsibility because he participated in services. It was further argued that any of respondent's missteps were due to the fact he was a new dad. Respondent's failure to register was merely a "mistake." Respondent acknowledged that there could not be any reasonable progress or reasonable efforts during the time he was incarcerated, which was three months of the relevant time period for the twins and six months of the relevant time period for Ja. A. Respondent highlighted the fact that once he was incarcerated he completed a parenting class and sent a letter asking for visitation.

¶ 36    In rebuttal, the State pointed out that section 1(D)(b) is in the disjunctive, such that a lack of either concern, interest, or responsibility is sufficient. The State focused on a lack of responsibility and argued that "it was frankly irresponsible for the father to have failed to register based on such a serious underlying crime which resulted in his incarceration which removed him from the ability to make demonstrable movement towards return home even before he was

incarcerated." The State also pointed out that respondent had not moved toward unsupervised visits, *i.e.*, a demonstrable movement towards a return home, in two-and-a-half years.

¶ 37    The court determined that the State had met its burden with respect to Janica M. However, as to respondent, the court stated, "I cannot say that the State has met its burden by clear and convincing evidence that the father failed to maintain a reasonable degree of interest, concern, or responsibility or that he failed to make reasonable efforts to correct the conditions or reasonable progress towards the return of the children to him within the relevant time period." The court entered an order on May 18, 2018, dated *nunc pro tunc* to May 16, 2018, denying the motion for termination of parental rights as to respondent.

¶ 38    On May 22, 2018, respondent filed a motion for a new permanency hearing. On May 30, 2018, the public guardian, on behalf of the minors, filed a petition for leave to appeal to this court pursuant to Illinois Supreme Court Rule 306(b)(2) (eff. Nov. 1, 2017), numbered as appeal No. 1-18-1065. The petition was allowed on June 7, 2018.

¶ 39    Respondent's motion for a new permanency hearing was continued over respondent's objection. On September 12, 2018, the court entered an order requiring that all additional argument or briefs regarding respondent's possible unfitness must be filed by October 9, 2018.

¶ 40    Also on September 12, 2018, the public guardian filed a motion with this court to hold briefing in abeyance in appeal No. 1-18-1065, because "[d]uring an off the record conference after the commencement of the permanency hearing, the trial court expressed that it believed that it had reversed its May 16, 2018[,] decision on unfitness on June 5, 2018." This court granted the motion and held briefing in abeyance for 21 days. Thereafter, on October 12, 2018, the public guardian filed a motion to dismiss appeal No. 1-18-1065 and issue the mandate instanter, which was granted on October 23, 2018. On October 25, 2018, this court issued the mandate.

¶ 41    On December 3, 2018, the public guardian filed a motion to reconsider its original decision that respondent was not unfit. On December 6, 2018, the public guardian filed its closing argument and memorandum in support of its motion to reconsider. Respondent filed his closing statement on December 7, 2018.

¶ 42    On February 19, 2019, the circuit court heard argument on the State's motion to reconsider its May 16, 2018, finding that respondent was not unfit. The State and the public guardian argued in favor of respondent's unfitness under sections 1(D)(b) and 1(D)(m) of the Adoption Act and respondent argued against it. Before issuing its ruling, the court noted that it had moved on its own to reconsider the ruling that the father was fit and granted the parties leave to reargue the case. The court ruled as follows:

> "The court finds that the father failed to maintain a reasonable degree of concern and responsibility and failed to make reasonable efforts to correct the conditions of reasonable progress towards return of the children within the relevant nine-month period.
>
> First, the father was incarcerated for a period of time for his known failure to register as a murderer. The father had [two-and-a-half] years for the older children and over a year for the younger child to make the necessary progress. During that period of time he failed to make reasonable progress in his services. Reasonable is defined as measurable or demonstrative movement.
>
> In July of 2016[,] the worker was notified that the parents would no longer seek reunification as a couple, and at that point additional services were recommended as the clinicians had determined they had concerns about dad's ability to parent independently as a single parent.

Dad's visits were inconsistent. He went for long periods of time, September 2016 through November 2017, without any visitation, partially due to a clinical finding that visits while incarcerated were not in the best interest of the children, to which the father agreed.

And even after his release from incarceration, he did not immediately ask for visitation, nor did he send any cards, gifts or letters to the children during his incarceration.

In its original ruling, the court incorrectly referred to some of the best interest factors, did not give adequate weight to the father's change in status from joint to single parenting and his lack of contact in person or otherwise with the minor. Therefore, the State has met its burden by clear and convincing evidence that the father is unfit and that he failed to maintain a reasonable degree of concern and responsibility and failed to make reasonable progress towards the goal of return home."

¶ 43    Respondent orally moved to reconsider the court's ruling, which was denied. The court also conducted a best interest hearing on that date. On August 5, 2019, respondent filed a motion to strike the portion of the public guardian's brief that recited facts and testimony from the best interest hearing. Although we denied respondent's motion to strike on August 20, 2019, respondent has not appealed the court's best interest decision, and thus we do not it address it or consider it in this order.

¶ 44    Respondent timely filed his notice of appeal on March 1, 2019. Although the State and the public guardian filed separate response briefs, the State adopted all contentions of the public guardian without advancing any arguments of its own, and thus their positions in this appeal are identical.

¶ 45                                    ANALYSIS

¶ 46     On appeal, respondent asserts that the trial court erred in finding him unfit pursuant to sections 1(D)(b) and 1(D)(m) of the Adoption Act. The State must prove by clear and convincing evidence that a respondent is an unfit parent. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). We afford great deference to a trial court's finding of unfitness because the trial court is in the best position to view and evaluate the parties and their testimony, and thus we will not reverse unless the trial court's finding was against the manifest weight of the evidence. *Id.* at 498-99. A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. *Id.* at 498.

¶ 47     Further, "[e]ach case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. *Id.*

¶ 48                Unfitness Pursuant to Section 1(D)(b) of the Adoption Act

¶ 49     Section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) provides that a person may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." The trial court found respondent unfit under section 1(D)(b) of the Adoption Act, finding that he "failed to maintain a reasonable degree of concern and responsibility." Because the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010).

¶ 50    Ground (b) does not focus on a parent's success but, rather, the reasonableness of his efforts and takes into account the parent's difficulties and circumstances. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). "However, our courts have repeatedly concluded that a parent is not fit merely because [he] has demonstrated some interest or affection toward [his] child; rather [his] interest, concern and responsibility must be reasonable." *Id.* By way of example, "[n]oncompliance with an imposed service plan and infrequent or irregular visitation with the child may be sufficient to warrant a finding of unfitness under section (b)." *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). Unlike ground (m), which we address later in this order, ground (b) has no time constraint that limits our consideration of respondent's fitness. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 21.

¶ 51    The trial court found that respondent failed to maintain a reasonable degree of two of the three bases enumerated in ground (b)—concern and responsibility. Based upon our thorough review of the record in this case, we cannot conclude that the trial court's decision finding respondent unfit was against the manifest weight of the evidence. Instead, we find that the trial court's determination on these bases was entirely proper.

¶ 52    While we agree with respondent's assertion that his 2013 LSSI mental health assessment (respondent's exhibit No. 8) shows evidence that he reported that he was concerned about his separation from his children, we find that the entirety of the evidence clearly supported the court's finding that he failed to maintain a reasonable degree of concern or responsibility for the minors' welfare. Respondent was incarcerated for a year of the children's lives due to his failure to register as a murderer, which he was required to do for 10 years following his release from prison. Respondent was well aware of this duty and had successfully registered for three years. At the hearing, when asked about his failure to register, respondent stated that it had "slip[ped]

[his] mind" because he was "most focused on [his] kids being in DCFS." Such an explanation is not reasonable because respondent knew that if he did not register, he would be incarcerated and further away from his children. Thus, his failure to register evidences his lack of responsibility.

¶ 53    Further, due to his incarceration, respondent was unable to visit with the children from September 2016 through September 2017. The evidence showed that respondent had self-reported being incarcerated on August 26, 2016, but did not turn himself in until September 29, 2016. Additionally, although respondent was released in September 2017, he did not visit with the children until November 2017. Respondent did not provide any reason for these delays. As we also discuss later in this order, respondent failed to maintain responsibility for his children when he failed to complete the recommended services for him to proceed towards reunification as a single parent. "It is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the child[ren] may support a finding of unfitness under both sections (b) and (m)." *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 54    De Groh testified that she met with respondent on October 13, 2017, and informed him that he needed to complete a mental health assessment and a substance abuse assessment. She also provided him with a list of community providers that could perform those assessments since the permanency goal had been changed from return home, and thus the agency would no longer cover those services. De Groh further testified that respondent told her that he had an appointment scheduled for his mental health assessment, but she was never able to verify that information. Although de Groh requested a copy of the mental health assessment, respondent never provided one. In addition to needing these assessments, and arguably most importantly, respondent failed to complete parent coaching as a single parent. According to the DCFS Family Service Plan, dated January 10, 2018—respondent's exhibit 18—respondent was then "still in

need of parent coaching." The plan specifically stated that respondent was "referred for additional parenting services in October 2017" but "reported in December 2017 that he ha[d] not attempted or completed any return home services at this time." Respondent's failure to complete the services that would have put him on the right track for return of his children evidences a lack of reasonable concern or responsibility for his children.

¶ 55    The evidence also showed a lack of concern and responsibility for the minors' welfare where respondent fed them sausages and bone-in chicken wings, which are choking hazards, and fell asleep during a visitation. Additionally, the only evidence of respondent's concern for his children while he was incarcerated was a single letter sent to LSSI, dated December 20, 2016. However, the date of this letter actually shows that respondent waited three months to inquire about the well-being of his children. Additionally, respondent did not send any other letters requesting an update on the boys nor did he send any cards or gifts.

¶ 56    Further, prior to his incarceration, respondent's visitation with Ja. A. was inconsistent. De Groh testified that respondent and Janica M. did not consistently attend the weekly visit with Ja. A. at the agency. Specifically, respondent only attended one or two visits per month with Ja. A. during December 2015 through August 2016.

¶ 57    As a final matter, we note that without citation to the record, respondent twice states in his brief that he showed concern and responsibility for his children when he "severed his relationship with the mother in order to regain custody of his children." It is well settled that "[t]he failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequences of which is the forfeiture of the argument." *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 12. However, even if respondent did not forfeit such a contention, we find it meritless where respondent was in a relationship with Janica M. for a substantial

26

portion of the children's lives. Respondent and Janica M. were together from the time the twins were born in August 2013 and did not separate until July 2016. In fact, most of the services that respondent completed were with Janica M. as a co-parent. Further, although respondent may have showed willingness to participate in services as a single parent, he did not follow through or engage in those services. Thus, respondent's contention that he ended their relationship so that he could get the children back seems disingenuous, especially in light of the fact that no evidence of this appears to have been presented to the trial court.

¶ 58    Although respondent may have shown interest in his children, the State proved by clear and convincing evidence that he failed to maintain a reasonable degree of concern and responsibility for their welfare. Thus, we affirm the trial court's finding of unfitness pursuant to ground (b).

¶ 59             Unfitness Pursuant to Section 1(D)(m)(ii) of the Adoption Act

¶ 60    Because we have already determined that the trial court's finding under section 1(D)(b) was not against the manifest weight of the evidence, we affirm its ultimate determination that respondent was unfit. See *In re Daphnie E.*, 368 Ill. App. 3d at 1064 (a trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act). However, for the sake of completeness, we address its additional finding pursuant to section 1(d)(m) of the Adoption Act.

¶ 61    Under section 1(D)(m)(ii) of the Adoption Act a parent may be found unfit when there is a "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m)(ii) (West 2018).

27

¶ 62    Whether a parent has made reasonable progress "is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At minimum, reasonable progress necessitates measureable or demonstrable movement toward the goal of reunification. *Id.* "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.*

¶ 63    As previously stated in this opinion, "[i]t is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the child[ren] may support a finding of unfitness under both sections (b) and (m)." *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18. Unlike ground (b), ground (m) contains a timeframe limitation, and thus in this section, we narrow our examination of respondent's progress towards reunification, including aspects such as his service plan and regularity of visitation, within the nine-month periods set forth by the State.

¶ 64        Reasonable Progress Toward Return Home for the Twins (Je. A. and E.A.)

¶ 65    For the twins, the State proceeded on the nine-month period from January 19, 2016, through October 19, 2016, alleging that respondent failed to make reasonable progress towards reunification. Respondent argues that he made reasonable progress during this time period because he complied with the DCFS service plans covering this nine-month period. We disagree.

¶ 66    DCFS Family Service Plans are created to review a parent's progress over the prior six months. The following plans covered the time period of January 19, 2016, through October 19, 2016:

(7) DCFS family service plan, dated July 27, 2016, stating that respondent had been arrested in April 2016 due to a failure to report the location of his residence, went to

28

bond court in April and May 2016, and self-reported of being incarcerated on August 26, 2016. The plan stated that respondent was being sentenced to two years' imprisonment. The plan noted that visits with Ja. A. that were set to occur on Wednesdays were occasionally cancelled or missed.

(8) DCFS family service plan, dated October 26, 2016, reflecting respondent's incarceration and containing no updates regarding respondent's progress. However, the plan reflected that the permanency goal was changed by the court on October 19, 2016, to termination of parental rights because "[b]iological parents did not comply with services."

¶ 67    These plans do not demonstrate the progress that respondent suggests. In fact, they show a substantial lack of progress. Respondent contends that in the July and October 2016 service plans, he was rated satisfactory in every area identified. This is inaccurate. The October service plan specifically stated that the permanency goal set by the court on October 19, 2016, was termination of parental rights because "[b]iological parents did not comply with services." Although de Groh testified that she would have rated respondent as satisfactory for parenting coaching from January through April 2016, this does not reflect progress made because those services were conducted in his home during visits while he was still being coached as a co-parent with Janica M. Further, although in May 2016 LSSI was still recommending a goal of return home within 12 months, this too was based on respondent and Janica M. parenting as a unit. In July 2016, respondent informed de Groh that he was no longer seeking reunification with Janica M. As a result, respondent needed to be reassessed for all services as a single parent with the three minors. De Groh testified that, at the beginning of 2016, respondent's visits were always

29

supervised and there was never a recommendation for unsupervised visits with all three children. This does not reflect progress towards reunification.

¶ 68    In addition to the foregoing, there was no evidence that would have supported a conclusion by the trial court that the twins were near being returned to respondent in the "near future." See *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. According to de Groh, at the end of September 2016, respondent had just been reincarcerated with a projected two-year sentence. That respondent only ended up serving one year does not change the fact that his incarceration resulted in him being further from the goal of return home, not closer. What progress had been made, if any, by respondent in the relevant nine months was impeded by the setback of his incarceration, which prevented him from completing the services.

¶ 69                    Reasonable Progress Toward Return Home for Ja. A.

¶ 70    For Ja. A., the State proceeded on the nine-month period from June 9, 2016, through March 9, 2017, alleging that respondent failed to make reasonable progress towards reunification.

¶ 71    Similar to our foregoing findings regarding the twins, we also find that respondent failed to make reasonable progress toward reunification with Ja. A. due to his failure to complete the requisite services. Each of the following service plans covered some portion of Ja. A's nine-month period:

> (7) DCFS family service plan, dated July 27, 2016, stating that respondent had been arrested in April 2016 due to a failure to report the location of his residence, went to bond court in April and May 2016, and self-reported of being incarcerated on August 26, 2016. The plan stated that respondent was being sentenced to two years' imprisonment.

The plan noted that visits with Ja. A. that were set to occur on Wednesdays were occasionally cancelled or missed.

(8) DCFS family service plan, dated October 26, 2016, reflecting respondent's incarceration and containing no updates regarding respondent's progress.

(9) DCFS family service plan, dated January 26, 2017, reflecting respondent's incarceration and stating that although respondent self-reported his incarceration on August 26, 2016, he did not turn himself in until September 29, 2016. Further, "LSSI clinically staffed visitation for [respondent] in November 2016 and found visits were inappropriate at this time for all the minors."

(10) DCFS family service plan, dated June 30, 2017, stating respondent's prison discharge date was September 17, 2018. The plan was also updated to reflect that "[w]hen [respondent] is released he will have to be reassessed for services as a single parent."

¶ 72    These service plans do not contain evidence of reasonable progress towards reunification. Respondent consistently points to services he completed outside the nine-month time frame, which are irrelevant to our analysis of his unfitness under section 1(D)(m). The majority of respondent's exhibits were not only for completion of services that were not required by the agency, but many were dated well before the relevant nine-month time periods. In fact, six of those certificates were even dated prior to the children's births. Thus, we do not find that the trial court's decision was against the manifest weight of the evidence.

¶ 73    In addition to failing to complete parenting coaching during the nine-month period applicable to Ja. A., respondent was incarcerated for approximately six of the nine months. See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 ("Time in prison is included in the nine-month period

during which reasonable progress must be made."). We acknowledge that "[t]he mere fact of incarceration is not evidence of failure to make reasonable progress" but emphasize that "incarceration can impede progress toward the goal of reunification." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. We find that respondent's incarceration certainly impeded his progress. During his incarceration, respondent did not have any visitation with any of his children and was not able to complete any of the necessary services. Although he completed a parenting class while in the Danville Correctional Center, that class was not a substitute for the single-parent coaching that respondent needed. Further, the certification of completion for the parenting class—respondent's exhibit 19—was dated May 8, 2017, which is outside the nine-month time period for both the twins and Ja. A. The impact of respondent's incarceration was even greater as applied to Ja. A., because not only was he incarcerated for nearly two-thirds of the nine-month period at issue, at the time of respondent's incarceration, Ja. A. was not even 14 months old, and thus the year that respondent spent in prison was then approximately half of Ja. A.'s life. Thus, it was even less likely that Ja. A. would have been returned to respondent "in the near future," when respondent did not have visitation with him for nearly half his life and had not engaged in the required parenting coaching. Despite years of services, the boys were simply not closer to reunifying with respondent. That respondent's personal circumstances prevented him from making reasonable progress is irrelevant to the " 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)).

¶ 74                                    CONCLUSION

¶ 75    For the foregoing reasons, we affirm the trial court's judgment.

¶ 76    Affirmed.

No. 1-19-0467

| | |
|---|---|
| **Cite as:** | *In re Je. A.*, 2019 IL App (1st) 190467 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 13-JA-790, 13-JA-791, 15-JA-795; the Hon. Andrea Buford, Judge, presiding. |
| **Attorneys for Appellant:** | Elizabeth Powell Butler, of Northbrook, Illinois, for appellant. |
| **Attorneys for Appellees:** | Kimberly M. Foxx, State's Attorney, County of Cook (Alan J. Spellberg, Gina Divito, Leslie Billings, Assistant State's Attorney's, of counsel), for petitioner- appellee.<br><br>Charles P. Golbert, Cook County Public Guardian (Kass A. Plain, of counsel), for minors-respondents-appellees. |