2025 IL App (2d) 250236-U
No. 2-25-0236
Order filed October 24, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* H.C.I. and E.I.C., Minors | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | Nos.    22-JA-58 |
| | ) | 22-JA-137 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Hilda I.C., | ) | Kathryn D. Karayannis |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial counsel was not ineffective for failing to present evidence of respondent's financial stability, mental health, or sobriety.

¶ 2    Respondent, Hilda I.C., timely appeals the circuit court of Kane County's orders terminating her parental rights over her children, H.C.I., and E.I.C. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On June 7, 2022, the State filed its amended petition for adjudication, alleging that H.C.I. was neglected as defined by section 2-3 of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) (Act), because his environment was injurious to his welfare. At the July 29, 2022, adjudicatory hearing, the State presented a factual basis for its petition, describing how, in April

2022, Ronaldo C.M. was charged with aggravated domestic battery after choking and punching Hilda at their home. Days later, an investigator visited the home and found that Ronaldo was still living with Hilda and H.C.I. At the conclusion of the hearing, the court found that H.C.I. was neglected due to his injurious environment.

¶ 5    On September 8, 2022, the parties appeared for disposition. After Hilda waived her right to a hearing, the court found that H.C.I. was neglected, that Hilda was unfit, and that it was in H.C.I.'s best interests to be made a ward of the court. The court set a goal for H.C.I. to return home within 12 months.

¶ 6    On November 15, 2022, E.I.C. was born. Two days later, on November 17, 2022, the State filed another petition for adjudication, alleging that he too was a neglected minor by virtue of his injurious environment. On February 10, 2023, Hilda waived her right to an adjudicatory hearing. The court found that E.I.C. was a neglected minor and that Hilda was unfit. Consequently, E.I.C was made a ward of the court.

¶ 7    On April 28, 2023, the parties appeared for a permanency hearing. The court specified that the "appropriate permanency goal for [both] minors [was to] return home within 12 months." Referring to reports filed by the Department of Children and Family Services (DCFS) and Court Appointed Special Advocates (CASA), the court found that Hilda was "making efforts" towards this goal, but not "substantial progress." Specifically, she had been unsuccessfully discharged from therapy and became "verbally aggressive" with a case worker. Further, she failed to provide DCFS with a valid address and missed several drug tests.

¶ 8    On August 10, 2023, the parties appeared for a status hearing. The court noted that Hilda had been "unsuccessfully discharged" after six sessions of parental coaching, although she did complete her assigned parenting classes. While she had finished a domestic violence victim's program, she still needed to complete "additional domestic violence services." In all, the court

found that Hilda was not "making appropriate efforts or making sufficient progress in her services."

¶ 9    On October 26, 2023, the court held another permanency review hearing. It referred to certain reports in finding that Hilda had been "making efforts," but with "limited" progress.

¶ 10    On January 17, 2024, the parties appeared for another permanency review hearing. Before continuing the matter, it noted its concern that Hilda had not been "participating in all of [her] necessary services" or "making progress in [those] services." While investigators still had not received Hilda's address, she provided the court with an Elgin address where she purportedly lived with several other individuals.

¶ 11    On April 16, 2024, DCFS filed a permanency hearing report prepared by supervisor Stephanie Sanders. In the report, Sanders described a recent episode in which Hilda had become "very upset" with her parenting coaches "because they were unwilling to let Hilda give [E.I.C.] a piece of birthday cake that she had brought for [H.C.I.]'s birthday." According to the report, Hilda gave E.I.C. some frosting from the cake despite DCFS' warnings, which prompted a rash that lasted over a week.

¶ 12    On June 7, 2024, the parties appeared for another permanency review hearing. Cynthia Diaz, a monitor with Roan Solutions, testified that Hilda was discharged "satisfactorily" from certain of her parenting classes. However, Hilda would often "become upset" when discussing E.I.C.'s food allergies and would deny giving him any foods triggering a reaction. She recalled the incident involving H.C.I.'s birthday cake but denied that Hilda gave E.I.C. any frosting.

¶ 13    On July 25, 2024, H.C.I.'s guardian *ad litem* filed a permanency hearing report which indicated that, as of July 11, 2024, Hilda had been assigned a new therapist, Wes Kennedy. However, she had missed her first two appointments with him. A follow up report, filed on

September 25, 2024, stated that Hilda had been discharged from therapy due to "missing too many visits."

¶ 14    On October 4, 2024, after several delays, the parties appeared for a continued permanency review hearing. After reviewing the pertinent reports, the court found that Hilda had made "some efforts," towards reunification, but not "reasonable efforts." Similarly, Hilda "made some progress, [but] not more than minimal progress." Specifically, she had been discharged from individual therapy "on two separate occasions," continued to disregard E.I.C.'s allergies, had stopped attending drug tests, failed to share information concerning her current residence, had not attended domestic violence counseling, and generally did not cooperate with DCFS. The court entered orders specifying that the children's new appropriate permanency goal was "[s]ubstitute care pending determination of termination of parental rights."

¶ 15    On October 7, 2024, the State filed its petition for termination of parental rights as to E.I.C., alleging that Hilda was unfit because she: (1) failed to maintain a reasonable degree of interest in him (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect him from his injurious environment (*id.* § 1(D)(g)); (3) failed to make reasonable efforts towards reunification between March 31, 2023, and December 31, 2023 (*id.* § 1(D)(m)(i)); (4) failed to make reasonable progress towards reunification between March 31, 2023, and December 31, 2023 (*id.* § 1(D)(m)(ii)); (5) failed to make reasonable efforts towards reunification between January 1, 2024, and October 1, 2024 (*id.* § 1(D)(m)(i)); and (6) failed to make reasonable progress towards reunification between January 1, 2024, and October 1, 2024 (*id.* § 1(D)(m)(ii)).

¶ 16    On January 3, 2025, the State filed its amended petition for termination of parental rights as to H.C.I. The petition alleged that Hilda was unfit in that she: (1) failed to maintain a reasonable degree of interest as to H.C.I.'s welfare (*Id.* § 1(D)(b)); (2) failed to protect him from his injurious environment (*id.* § 1(D)(g)); (3) failed to make reasonable efforts towards reunification during the

nine month period between July 30, 2022, and April 30, 2023 (*id.* § 1(D)(m)(i)); (4) failed to make reasonable progress towards reunification between July 30, 2022, and April 30, 2023 (*id.* § 1(D)(m)(ii)); (5) failed to make reasonable efforts towards reunification during the nine month period between May 1, 2023, and February 1, 2024 (*id.* § 1(D)(m)(i)); (6) failed to make reasonable progress towards reunification during the nine month period between May 1, 2023, and February 1, 2024 (*id.* § 1(D)(m)(ii)); (7) failed to make reasonable efforts towards reunification during the nine month period between February 2, 2024, and November 2, 2024 (*id.* § 1(D)(m)(i)); and (8) failed to make reasonable progress towards reunification during the nine month period between February 2, 2024, and November 2, 2024 (*id.* § 1(D)(m)(ii)).

¶ 17    On February 24, 2025, the court commenced its termination hearing. Alissa Pienkowski, a former DCFS caseworker, testified regarding the various services that Hilda had failed to complete, including certain domestic violence classes and individual therapy. She recalled visiting a residence where Hilda claimed to live, although Hilda denied her access to certain locked areas of the home. She believed that Hilda did not have a bedroom there and was instead sleeping on a couch. Throughout the case, Hilda had moved across "multiple towns," though she had her own bedroom in at least one of her other residences.

¶ 18    Amber Rakoczy, the director of Roan Solutions, testified regarding Hilda's participation in parenting classes, coaching, individual therapy, and visitations. As of May 1, 2024, Jessica Martinez, Hilda's therapist, left Roan. At that time, Martinez told Rakoczy that she recommended Hilda "continue in services." However, Hilda purportedly believed she had completed her required therapy. After confirming this was not the case, Rakoczy assigned a new therapist, Wes Kennedy, to resume Hilda's treatment. After Hilda missed four sessions, she was discharged on August 17, 2024.

¶ 19    Hilda testified that, after her children were removed, the court ordered her to complete services such as domestic violence classes, parenting classes, individual therapy, and parenting coaching. She generally described the lessons she had taken away from the services she had completed and acknowledged that she had not completed her individual therapy. She initially felt "comfortable" speaking with Martinez, who had told her that she was "making progress." However, she did "not really" like her last therapist, Kennedy. Nonetheless, after being discharged, she sought another referral to finish her required therapy. However, DCFS refused to assist her.

¶ 20    Stephanie Sanders, a supervisor for DCFS, testified that Hilda was recommended to complete parenting classes, parental coaching, therapy, and domestic violence counseling. She had completed her parenting classes, coaching, and some initial domestic violence counseling—albeit after several referrals. Hilda also was "very consistent" in attending visitations with H.C.I. and E.I.C. Once Hilda was discharged from therapy and the court changed its permanency goal to substitute care, DCFS was no longer "financially obligated" to refer her to another therapist. Further, Hilda was not referred to family counseling as a result of her discharge from individual counseling.

¶ 21    Sanders also described how Hilda would only "sporadically" attend drug screens, and that her various, missed tests were considered to be positive results. Additionally, Sanders personally found it difficult to schedule home visits with Hilda, as Hilda would "not follow through *** or tell [Sanders] when she was available." Consequently, she had not seen where Hilda was living since May 2024. Sanders had seen some vague paystubs as proof that Hilda held "several jobs" "throughout the duration of this case," but, because Hilda was "working under the table," she was unable to provide Sanders with any actual verification of her employers.

¶ 22    On May 16, 2025, the court delivered its ruling. It described Hilda's spotty attendance for many of her recommended services, her combative nature with case workers, and failure to provide

sufficient information concerning her employer. Given these shortcomings and her refusal to appreciate the reasons underlying the children's removal, the court agreed that Hilda was unfit for all of the reasons alleged in the State's petitions. The matter proceeded to a final hearing, after which the trial court found that it was in the minors' best interests that Hilda's parental rights be permanently terminated. Hilda timely appeals.

¶ 23                                    II. ANALYSIS

¶ 24     On appeal, Hilda argues that the trial court erred in finding her unfit for failing to protect the children from their injurious environment. She further asserts that, but for the ineffective assistance of her trial counsel, the court would not have found her unfit pursuant to the State's remaining allegations—that she failed to maintain a reasonable degree of interest in the children, that she showed reasonable efforts towards unification during the pertinent time periods, and that she showed reasonable progress during those same periods.

¶ 25     Proceedings to terminate parental rights are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). In order to involuntarily terminate a party's parental rights, the court must first find that, by clear and convincing evidence, the parent is unfit as defined in the Adoption Act. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). A parent is unfit, for instance, where they fail "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ." 750 ILCS 50/1(D)(m)(ii) (West 2022). "Whether a parent has made reasonable progress 'is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent.' " *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1067 (2006)). "Progress is considered in light of both the circumstances that gave rise to the original loss of custody as well as any other conditions that later become known." *In re D.P.*, 2024 IL App (1st) 231530, ¶ 43. "Reasonable progress exists

when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.* After finding a parent to be unfit, the court next considers the child's best interests to determine whether parental rights should be terminated. *In re J.L.*, 236 Ill. 2d 329, 337-38.

¶ 26    "As a general rule, a trial court's finding that a parent is unfit under section 1(D) of the Adoption Act will not be reversed on appeal unless that finding is against the manifest weight of the evidence. [Citation.] A trial court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *In re N.G.*, 2018 IL 121939, ¶ 29. Because only one statutory ground is necessary to support a finding of unfitness, we may affirm the trial court's judgment if any single alleged ground is sufficiently supported by the record. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 43.

¶ 27    Here, Hilda argues that the trial court's findings that she did not make reasonable progress during the relevant time periods were solely the result of her attorney's ineffective assistance. Specifically, she contends that, had her counsel properly emphasized her financial stability, lack of mental health issues, and sobriety, there is a reasonable probability that the court would have found that she made reasonable progress during each of the relevant nine-month periods. We disagree.

¶ 28    "Although there is no constitutional right to counsel in proceedings pursuant to the Act, a parent has a statutory right to counsel in a proceeding to terminate his or her parental rights." *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 79. "Illinois courts apply the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel appointed under the *** Act." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. "To prevail on such a claim, a [party] must show that counsel's performance was (1) deficient and (2) prejudicial." *Id.* An attorney's performance is deficient where it falls below an objective standard of reasonableness. *Id.* ¶ 41. "To

establish prejudice, [a party] must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Id.* ¶ 41. Further, "[a] reasonable probability is defined as a probability that undermines confidence in the outcome of the trial. [Citation.] Failure to satisfy either prong precludes a finding of ineffective assistance of counsel." *Id.*

¶ 29    We first note that, despite Hilda's arguments to the contrary, her counsel *did* underscore her sobriety during closing arguments. Specifically, counsel acknowledged that Hilda had missed various drug tests but argued that "[s]he has never had a substance abuse problem" and that "substance abuse has never been an issue in this case." Accordingly, Hilda's suggestion that she was prejudiced because her trial counsel "failed to point out" her sobriety "in her closing" is directly contradicted by the record, and we reject the argument.

¶ 30    Turning to Hilda's remaining claims of ineffective assistance, even assuming *arguendo* that counsel was deficient in failing to emphasize Hilda's financial stability and mental health, she has not demonstrated any resulting prejudice. To this point, the record clearly shows that the court's findings regarding reasonable progress were not based on Hilda's financial situation or any mental illness, but rather on her failure to complete recommended services through the relevant periods and her uncooperative, unyielding nature. Indeed, "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives," in light of the specific circumstances. *In re C.N.*, 196 Ill. 2d 181, 216-17. Here, the court's termination hearing order explicitly found that Hilda "did not timely complete her services," and that "she did not make any progress" in the limited services she had done. The order goes on to describe Hilda's discharge from therapy as an example.

¶ 31    On the other hand, the court made no mention of any suspected mental illnesses when issuing its fitness ruling. While it did reference Hilda's finances in its oral findings, it did not express any reservations that Hilda was financially unstable. Instead, mentioning her failure to provide DCFS with appropriate pay stubs, it noted that she was likely "being paid under the table," and that it did not "fault people for that." Because the court's findings concerning reasonable progress were largely unrelated to Hilda's financial stability and mental health, any hypothetical failure by counsel to introduce evidence concerning those issues could not have affected the outcome of the proceedings. Accordingly, Hilda has not established prejudice, and her claim of ineffective assistance of counsel fails. *A.P.-M.*, 2018 IL App (4th) 180208, ¶ 41. As a result, Hilda has failed to show that the court's findings concerning reasonable progress were against the manifest weight of the evidence. Because we may affirm the trial court's judgment if any one alleged ground of unfitness is sufficiently supported by the record, we need not address Hilda's remaining arguments, as acknolwedged by Hilda in her reply brief. *Tr. A.*, 2020 IL App (2d) 200225, ¶ 43.

¶ 32                                III. CONCLUSION

¶ 33     For these reasons, we affirm the judgment of the circuit of Kane County.

¶ 34    Affirmed.