NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250205-U

NOS. 4-25-0205, 4-25-0206, cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.M. and H.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 20JA121, |
| v. | ) | 20JA316 |
| Daje M., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the trial court's order terminating respondent's parental rights where the court did not consider improper evidence and neither the court's unfitness nor best-interest findings was against the manifest weight of the evidence.

¶ 2   Respondent, Daje M., is the mother of M.M. and H.M. In 2021, the State filed a motion to terminate respondent's parental rights. Following hearings in 2022, the trial court denied the State's motion, finding that the State failed to prove that respondent was unfit by clear and convincing evidence. In 2024, the State filed a renewed motion to terminate respondent's parental rights. Following hearings on that motion, the court ruled that respondent was unfit and that it was in the best interest of M.M. and H.M. to terminate respondent's parental rights. Respondent appeals, arguing that the court erred in (1) admitting and considering evidence from the 2022 termination hearings, (2) finding her unfit, and (3) finding that terminating her parental rights was

in the minors' best interest. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                     A. Juvenile Neglect Petitions and Dispositional Hearings

¶ 5          On May 20, 2020, the State filed a petition alleging that H.M., who was two years old, was a neglected minor pursuant to section 2-3(1)(a)-(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a)-(b) (West 2020)) because (1) she was "not receiving the proper care and supervision necessary for her wellbeing in that [respondent] failed to make a proper care plan" and (2) her "environment [was] injurious to his [*sic*] welfare as evidenced by the domestic violence between [respondent] and [her] paramour." At the shelter care hearing held the same day, the trial court found shelter care to be necessary for H.M. because of "domestic violence." The court entered an order placing H.M. in shelter care and granting temporary custody and guardianship of H.M. to the Illinois Department of Children and Family Services (DCFS), with authority to place her.

¶ 6          On August 6, 2020, the trial court found H.M. neglected as alleged in the first allegation of the petition because "police [were] called to [respondent]'s home on [a] report of domestic violence between [respondent] and [her] paramour, [and the] minor was present during dom[estic] viol[ence]." On September 2, 2020, the court held a dispositional hearing and entered an order adjudicating H.M. a ward of the court. The court's order advised respondent to "cooperate and show progress in services including domestic violence services[,] counseling, [and] parenting."

¶ 7          Respondent gave birth to another child, M.M., in late November 2020. On December 1, 2020, the State filed a petition alleging that M.M. was a neglected minor pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) in that her environment was

injurious to her welfare as evidenced by (1) M.M.'s "siblings being adjudicated neglected and [respondent]'s failure to make reasonable progress towards having the children returned to [her] care and remaining in the care of DCFS" and (2) "the domestic violence between [respondent] and her paramour."

¶ 8   On December 2, 2020, the trial court held a shelter care hearing and found there was probable cause to believe M.M. was neglected and that shelter care was necessary for her protection. The court entered an order placing M.M. in shelter care and granting temporary custody of M.M. to DCFS, with the right to place her. On January 20, 2021, the court entered an order adjudicating M.M. neglected based on "the second allegation" in the petition. The court's order stated that respondent and her "live-in paramour have a long-standing history of domestic violence," which also caused H.M. to be taken into custody. Additionally, respondent "reported multiple incidents of domestic violence during her pregnancy, and had bruises corroborating her account."

¶ 9   The trial court held a dispositional hearing on February 3, 2021. At that time, the court adjudicated M.M. a ward of the court and admonished respondent to "cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require [M.M.] to be in care, or risk the termination of [her] parental rights."

¶ 10   B. Subsequent Hearings and First Termination Proceeding

¶ 11   At the permanency review hearing on July 7, 2021, the trial court found it was in the best interest of M.M. and H.M. for the permanency goal to be "return home." At the next permanency review hearing on December 8, 2021, the court changed the permanency goal to "substitute care pending termination."

¶ 12   On December 21, 2021, the State filed a "Motion for Termination of Parental

Rights." The motion alleged that respondent was unfit for failing to (1) maintain a reasonable degree of interest, concern, or responsibility as to M.M.'s and H.M.'s welfare (750 ILCS 50/1(D)(b) (West 2020)), (2) make reasonable efforts to correct the conditions that were the basis for removal of the minors from March 8, 2021, to December 8, 2021 (750 ILCS 50/1(D)(m)(i) (West 2020)), and (3) make reasonable progress toward the return of the minors to her from March 8, 2021, to December 8, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 13        Proceedings on the motion were held on July 28, 2022, and November 3, 2022. On November 3, 2022, the trial court ruled that the State failed to prove by clear and convincing evidence that respondent was unfit for any of the reasons alleged by the State. The court admonished respondent to continue following the service plan and maintain contact with DCFS.

¶ 14        On November 3, 2022, the trial court entered a permanency review order indicating that the permanency goal for M.M. and H.M. was "Return Home [within] 12 months." However, at the permanency review hearing on December 13, 2023, the permanency goal was changed to "Substitute Care Pending Court Determination."

¶ 15                    C. Second Termination Proceeding

¶ 16        On January 17, 2024, the State filed a "Renewed Motion for Termination of Parental Rights." In that motion, the State alleged that respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility for M.M.'s and H.M.'s welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) make reasonable efforts to correct the conditions that were the basis for the removal of M.M. and H.M. from her during any nine-month period following "an adjudication of Neglect/Abuse" (750 ILCS 50/1(D)(m)(i) (West 2024)), and (3) make reasonable progress toward the return of M.M. and H.M. to her during any nine-month period following "an adjudication of Neglect/Abuse" (750 ILCS 50/1(D)(m)(ii) (West 2024)). The

nine-month periods alleged were (a) August 6, 2020, to May 6, 2021, (b) May 6, 2021, to February 6, 2022, (c) February 6, 2022, to November 6, 2022, (d) November 3, 2022, to August 31, 2023; (e) November 6, 2022, to August 6, 2023, and (f) April 6, 2023, to January 6, 2024.

¶ 17                                        1. *Unfitness Hearing*

¶ 18          The unfitness hearing began on August 15, 2024. Before any evidence was presented, the State informed the trial court as follows:

> "The State's intent is to introduce evidence for the purposes of the Court making a finding as to [respondent] *** for timeframes occurring after November 3rd of 2022.
>
> The State also will introduce some information *** for events occurring prior to November 3rd of 2022, for the purposes of context and providing the Court information only. Not for the judge to make any findings as to whether they are fit or not."

The State indicated that it "would like the court to take judicial notice of all of the testimony and evidence that was provided to this Court on July 28th, 2022, and November 3rd of 2022, during the hearing on the adjudication on the motion for termination of parental rights." The court reserved ruling on the State's request. Before offering any evidence, the State indicated its intent to proceed only on the allegations that respondent was unfit for failing to make reasonable efforts and reasonable progress during two of the time periods alleged in the renewed motion: (1) November 3, 2022, to August 31, 2023, and (2) April 6, 2023, to January 6, 2024. The State withdrew its allegations related to all other time periods contained in its renewed motion.

¶ 19          The State's first witness was Dr. Judy Osgood, a licensed clinical psychologist who evaluated respondent on March 21, 2023. Osgood testified that she discussed with respondent the

results of a substance abuse evaluation respondent completed in November 2022. As a result of that evaluation, respondent was diagnosed with a "substance abuse disorder" and recommended to complete "intensive outpatient substance abuse treatment." According to Osgood, respondent "denied that she had any problems with substance abuse" or that "she needed treatment." Respondent also denied using alcohol or marijuana, which Osgood found inconsistent with respondent's toxicology screenings, which were positive for tetrahydrocannabinol (THC).

¶ 20 Osgood testified that respondent was "very defensive about her DCFS case, her history of substance abuse, [and] domestic violence." Osgood testified that respondent "denied that she needed any treatment or services" and denied needing "help with anything; parenting, or *** mental health issues." Respondent refused to "engage in any kind of a meaningful discussion *** about her DCFS case, [or] her children" with Osgood. Respondent repeatedly told Osgood that she "hadn't learned anything" from the services she completed, including domestic violence treatment and counseling. Respondent was unable to "identify specific coping skills that she had learned or developed or was utilizing."

¶ 21 Based on her assessment, Osgood recommended that respondent (1) continue to have supervised visits with her children, (2) participate in "ongoing individual therapy," (3) "complete an assessment and monitor[ ] her mental health," (4) "participate in domestic violence services," including "support groups," (5) "develop a relapse prevention plan" because of "her extensive history of domestic violence," (6) complete "substance abuse treatment," and (7) "participate in community-based substance support groups." Osgood testified that she was concerned that respondent "was using alcohol and THC to self[-]medicate her mental health."

¶ 22 Osgood observed respondent interact with M.M. and H.M. and believed that respondent sincerely loves her children and has a bond with them but noted that respondent's bond

with M.M. is "[l]imited" because M.M. has never lived with respondent. Osgood determined that respondent "has never demonstrated the capacity to care for the safety and security of her children" based on her interview with respondent and DCFS records she reviewed.

¶ 23        The hearing continued on December 5, 2024. Jeremy Roberts, a Springfield police officer, testified that he was dispatched to respondent's residence on October 5, 2024, for "a criminal damage report." When Roberts arrived, respondent told him that the day before she and her boyfriend, Steven Bryerson, had an argument during which Bryerson grabbed her by the throat "and shoved her forehead into the front siding of the house, causing a minor contusion."

¶ 24        Laura Kuehnel, a caseworker at Family Service Center, testified that she has been M.M.'s and H.M.'s caseworker since May 2023. Prior to that, Lauren Masten was the children's caseworker. Before Kuehnel took over the case, Masten talked to Kuehnel and provided her with the history of the cases. According to Kuehnel, H.M. was taken into care when she was two years old "[d]ue to domestic violence" and was now seven years old. M.M. was taken into care "right after birth" due to "continued concerns of [domestic violence]" and was four years old.

¶ 25        The State moved to admit the service plans Kuehnel reviewed and maintained for M.M. and H.M. dated November 3, 2022, to December 13, 2023. The trial court admitted the service plans over no objection. Kuehnel testified that pursuant to those plans, respondent was required to cooperate with DCFS, visit M.M. and H.M., obtain and maintain stable housing and income, participate in substance abuse treatment, participate in mental health services, and engage in "domestic violence perpetrator services." Domestic violence perpetrator services were recommended because respondent was involved in two incidents of "physical aggression" against two individuals "in the same day" in April 2023. Kuehnel testified that she referred respondent to a domestic violence service provider in December 2023, but respondent never contacted that

provider. In March 2024, Kuehnel referred respondent to a new provider. Respondent completed an assessment with that provider in May 2024, but respondent never completed any sessions.

¶ 26 Respondent was employed in May 2023, but as far as Kuehnel knew, respondent did not maintain consistent employment from May 2023 to December 2024. Kuehnel testified that respondent failed to communicate with her regarding her employment despite Kuehnel's requests that she do so. Kuehnel testified that while she was the caseworker for M.M. and H.M., only three family team meetings took place. Kuehnel attempted to schedule more, but respondent often failed to respond to her.

¶ 27 According to Kuehnel, respondent did not engage in mental health services or counseling after January 2023. Kuehnel provided respondent with a referral for counseling in November 2023, but respondent never participated in any counseling sessions, and the service provider unsuccessfully discharged respondent in February or March 2024. Kuehnel provided respondent with another counseling referral in April or May 2024, but respondent never attended any counseling sessions with that provider.

¶ 28 Because of "allegations of alcohol abuse," respondent was ordered to complete a substance abuse assessment, which she did in late 2022. As a result of that assessment, respondent was ordered to participate in outpatient substance abuse services, but she never did so. Sometime in 2023, respondent was ordered to complete a second substance abuse assessment but never did so. Respondent was also ordered to engage in toxicology screenings monthly, but she did not complete any after December 2022.

¶ 29 Respondent's last visit with M.M. and H.M. was in March 2024. A visit was scheduled for April 2024, but respondent did not attend and did not call to reschedule. Respondent had no visits after April 2024 "[d]ue to safety concerns and threats that [respondent] had made."

According to Kuehnel, respondent "was threatening to go and find her children in the community and take them or go to the foster parents' home as well as [Kuehnel's] home."

¶ 30        Kuehnel rated respondent's cooperation with the agency as satisfactory in August 2023. Kuehnel agreed that M.M. and H.M. were excited to see respondent during visits and were comfortable around her. Kuehnel testified that respondent attended three family meetings between May and December 2023 and was cooperative during those meetings.

¶ 31        Kuehnel was notified that respondent was charged with battery against two different victims on April 15, 2023, and was alleged to have been drinking since 9 a.m. that day. Respondent was also charged with driving under the influence (DUI) on April 21, 2022. Over respondent's attorney's objection, the trial court took judicial notice of (1) a certified copy of respondent's DUI conviction, dated November 18, 2022, granting respondent court supervision provided that she complete 10 hours of "Alcohol & Drug Remedial Education" and 12 hours of "Alcohol/Drug Out Patient Treatment" within 10 months; (2) the State's petition to revoke supervision, dated September 26, 2023, because respondent (a) failed to provide proof of outpatient treatment and (b) on July 2, 2023, was charged with unlawful possession of cannabis and driving on a suspended license; and (3) the order, dated August 14, 2024, granting the State's petition to revoke.

¶ 32        Kuehnel testified to an incident that occurred in court in August 2023. On that date, Judge Tharp asked respondent to shut off her phone. Respondent refused to do so and became "disrespectful and angry." As she exited the courtroom, respondent was "[b]eing rude and disruptive," "combative, [and] yelling." When respondent attempted to come back into the courtroom, she was asked to leave again. After that, Kuehnel heard respondent "yelling and screaming in the hallway." Kuehnel testified that respondent was arrested in the hallway and

appeared to be resisting officers during her arrest.

¶ 33    Owen Hamelin, a Springfield police officer, testified that he responded to a call on April 15, 2023, from a woman named Zaleigh Grigsby. When he arrived at Grigsby's residence, he saw that she had a "small laceration to her bottom lip." Grigsby told Hamelin that respondent punched her face with a closed fist. Grigsby showed Hamelin footage from her Ring video camera. According to Hamelin, the footage showed Jaron, Grigsby's ex-boyfriend and respondent's boyfriend in April 2023, at Grigsby's door and then returning to his car. After that, respondent got out of Jaron's car, walked up to Grigsby's house, "pound[ed] aggressively on the door" and then walked back to the car. Following a verbal altercation between respondent and Grigsby, respondent "came back up to the door aggressively, and then *** you could see her body coming into the door fairly quickly, and then you could just hear a physical altercation." Hamelin could not see the physical altercation in the footage, but in Grigsby's home, Hamelin observed "numerous items scattered throughout the main entry and the kitchen/dining area," "a broken table," and "a foot-wide diameter hole in the wall just inside the entryway." According to Hamelin, Jaron and respondent were at Grigsby's home to pick up Jaron's children, who were in the car at the time of the altercation.

¶ 34    Hamelin testified that when he tried to locate respondent on April 15, 2023, he learned that she was in the Sangamon County jail after being arrested for another unrelated battery that day. When Hamelin spoke to respondent at the jail, she told Hamelin that "it was just a verbal altercation between her and [Grigsby], and then she decided to invoke her Fifth Amendment [rights (U.S. Const., amend. V)] and not try to incriminate herself by speaking any further." The trial court took judicial notice of a certified copy of respondent's conviction, entered on August 22, 2024, showing that respondent pled guilty to battery against Grigsby.

¶ 35        Respondent testified that she completed a parenting class in 2021 and always cooperated with Family Service Center and DCFS. Respondent testified that she consistently attended visitation with M.M. and H.M. She said she loves her children and that they love her. She has lived in the same house since her children came into DCFS's care. Respondent testified that she has worked at Burger King since August and before that worked consistently as a certified nursing assistant. Respondent testified that she completed the 10 hours of alcohol treatment required by the court after her DUI conviction. Respondent testified that she completed 19 weeks of mental health treatment through Southern Illinois University (SIU) Survivor Recovery Center. Respondent testified that she completed a domestic violence victim class, as well as a domestic violence assessment over the phone with a "lady," who did not recommend her for further domestic violence treatment. Respondent believed she had completed all her services and asked the trial court to return M.M. and H.M. to her.

¶ 36        On cross-examination, respondent agreed that she attended 18 sessions with SIU Survivor Recovery Center between 2021 and 2023 and canceled or failed to show up for 16 sessions during that same time period. Respondent admitted that she had a physical altercation with Grigsby on April 15, 2023, during which she entered Grigsby's home without her permission and punched Grigsby several times. When asked about the incident in court on August 30, 2023, respondent denied (1) becoming upset because the judge asked her not to use her cell phone in court, (2) being excused from the courtroom, (3) shouting and screaming, and (4) being arrested by court security. On redirect examination, respondent denied having an alcohol or anger problem. She also denied threatening Kuehnel.

¶ 37        The State argued that respondent should be found unfit because she "has not made substantial efforts or progress throughout the time frames that are alleged in our petition, and

because she has not demonstrated interest or concern or responsibility over her children." Before hearing from respondent's counsel, the trial court clarified that in considering the evidence, it was "only looking from November 3[, 2022,] forward because we haven't dealt with any issues on things prior to that in regards to legalities of what I can consider and can't consider." Respondent's counsel argued that respondent "loves her kids" and "they love her" and asked the court to deny the State's motion. M.M. and H.M.'s guardian *ad litem* (GAL) asserted that the State met its burden of proving that respondent failed to make reasonable progress and efforts during the two nine-month periods and "has not shown responsibility for the welfare of her children based on her actions."

¶ 38　　　　Before making its ruling, the trial court stated that it did not consider the second battery charge against respondent from April 15, 2023, because there was no conviction. The court also did not consider Hamelin's testimony about the Ring camera footage he viewed. However, the court did consider respondent's conviction for battery against Grigsby. The court found that "there are anger management, mental health, and domestic violence [issues] all over the place here." The court determined that respondent's efforts with respect to anger management, domestic violence and drug/alcohol abuse were "limited" and that her progress in those areas was "nonexistent." The court ruled that the State met its burden of proving by clear and convincing evidence that respondent failed to make reasonable efforts and progress during the two nine-month periods of November 3, 2022, to August 31, 2023, and April 6, 2023, to January 6, 2024, and "failed to maintain a reasonable degree of interest, concern, or responsibility as to both minors' welfare for that same period of time." The court entered a written order finding respondent unfit for those reasons. That order indicated that H.M.'s father was previously found unfit and that M.M.'s father previously surrendered his parental rights.

¶ 39                    2. *Best-Interest Hearing*

¶ 40            On February 27, 2025, the trial court held the best-interest hearing. Kuehnel testified that M.M. and H.M. were in different foster homes with nonrelatives. They had been in the same homes since they were taken into DCFS custody, which was more than four years ago. Kuehnel said both children were bonded with their respective foster families, participated in various activities, and attended community events. The girls interacted with and visited each other often, and their foster families were meeting their medical, educational, and social needs.

¶ 41            M.M. lived in a home with a foster mother, foster father, two foster sisters, and one foster brother. M.M.'s foster parents were willing to adopt her. H.M. lived with a foster mother, who was willing to adopt her. M.M. called her foster parents "mom" and "dad," and H.M. called her foster mother "mom." M.M. and H.M. had not seen respondent in almost a year because of threats she made. As a result of those threats, M.M.'s and H.M.'s foster parents sought and obtained orders of protection on behalf of M.M. and H.M. against respondent. The trial court took judicial notice of those orders of protection.

¶ 42            Kuehnel testified that M.M.'s and H.M.'s placements were in their best interest. H.M. wanted to stay in her current foster placement and did not want to see respondent. Kuehnel believed it was in M.M.'s and H.M.'s best interest to terminate respondent's parental rights. According to Kuehnel, M.M. and H.M. were thriving in their current foster homes.

¶ 43            Respondent's mother, Tunisia H., testified that she has lived in San Diego, California, for six years and works at the University of San Diego. She testified that she first asked for M.M. and H.M. to be placed with her at least two years ago. She testified that since then, she has been "getting the run around." Tunisia testified that she wanted M.M. and H.M. to be with her because she is family and "capable, willing and able to care for them." She testified that she visited

M.M. and H.M. two or three times during the four years they had been in foster care and last saw them two years ago.

¶ 44      Respondent testified that she currently works at Krispy Kreme. She said she loved her children and believed they loved her. Respondent testified that if M.M. and H.M. could not be returned to her, she wanted her mother to have custody of them. Respondent denied ever telling anyone that she did not want M.M. and H.M. to be placed with her mother and said she has been asking for them to be placed with her family "[s]ince day one." Respondent agreed that none of her family lives in Illinois.

¶ 45      The State argued that it was in the best interest of M.M. and H.M. for respondent's parental rights to be terminated because "they are stable and happy" in their current placements. Respondent's attorney asked for H.M. and M.M. to be placed with Tunisia, "who can teach them their heritage, [and] can keep them involved with their family." The GAL argued that it was in the minors' best interest to terminate respondent's parental rights because M.M. and H.M. "have been in care for over four years in the same placement where they are thriving, bonded and loved."

¶ 46      In making its ruling, the trial court noted that M.M. and H.M. "need stability and permanence." The court found "ample credible evidence" that M.M. and H.M.'s needs for love, attachment, and a sense of being valued are met in their current placements. The court noted that at no prior hearing, including the 2022 hearings on the original motion to terminate respondent's parental rights, did anyone raise the possibility of M.M. and H.M. being placed with Tunisia. The court found that removing M.M. and H.M. from their current placements would not be in their best interest and "would be a very traumatic experience" for them because M.M.'s foster home is the only home M.M. "has ever known" and H.M. has been in her foster home for "a significant amount of time." The court concluded that the State proved by a preponderance of the evidence that it was

in M.M.'s and H.M.'s best interest to terminate respondent's parental rights. Following the hearing, the court entered an order terminating respondent's parental rights and setting the permanency goal of adoption. This appeal followed.

¶ 47                                  II. ANALYSIS

¶ 48                    A. Trial Court's Admission and Consideration of Evidence

¶ 49            Respondent argues that the trial court erred in allowing the State to present evidence from the first termination proceeding and considering that evidence when ruling on the renewed motion. The State responds that the record refutes respondent's contentions and that respondent forfeited this issue by failing to cite the record to support her argument.

¶ 50            Initially, we agree with the State that respondent has forfeited this argument. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that an appellant's brief must contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Failing to provide proper citations to the record violates Rule 341(h)(7) and results in forfeiture of the argument. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 57. In her brief, respondent argued that the trial court admitted and considered evidence from the first termination hearing but never specified what evidence the court allegedly admitted and considered. Additionally, respondent failed to cite any portion of the record where the court admitted or considered evidence from the first termination hearing. Thus, respondent has forfeited this argument on appeal. See *Je. A.*, 2019 IL App (1st) 190467, ¶ 57.

¶ 51            Forfeiture notwithstanding, the record contradicts respondent's contentions. On the first day of termination proceedings on the State's renewed motion to terminate respondent's parental rights, the State indicated its intent to introduce evidence about "events occurring prior to November 3rd of 2022, for the purposes of context and providing the Court information only."

Specifically, the State asked the trial court to take judicial notice of the transcripts from the first termination hearing. The court did not immediately grant or deny the State's motion but reserved its ruling. Neither the court nor the parties ever explicitly mentioned this request again, and the court never admitted the transcripts from the first termination hearing into evidence. Furthermore, on the second day of proceedings, on the State's renewed motion, the court stated that in considering the evidence, it was "only looking from November 3[, 2022,] forward." Thus, the record refutes respondent's contentions that the court admitted and considered evidence introduced at the first termination hearing.

¶ 52                                B. Unfitness

¶ 53        Respondent next argues that the trial court erred in finding that the State proved by clear and convincing evidence that she was unfit.

¶ 54        The involuntary termination of parental rights involves a two-step process. 705 ILCS 405/2-29(2) (West 2024). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). A parent can be found unfit for failing

> "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i)-(ii) (West 2024).

Either ground is independently sufficient to support a finding of unfitness. *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 55　　　　Reasonable progress is assessed under an objective standard and exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails "to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care." 750 ILCS 50/1(D)(m) (West 2024). Importantly, there is "a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56.

¶ 56　　　　We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence only "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. Under this standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We "must not substitute [our] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 499. We may affirm the trial court's finding of unfitness if the evidence supports any ground. *In re D.D.*, 196 Ill. 2d 405, 422 (2001). Thus, we will focus our analysis only on whether respondent made reasonable progress.

¶ 57　　　　The evidence supported the trial court's finding that respondent was unfit for failing

"to make reasonable progress toward the return" of M.M. and H.M. during the relevant time periods. See 750 ILCS 50/1(D)(m)(ii) (West 2024). According to Kuehnel's testimony and the service plans admitted into evidence, during the relevant periods, respondent was to (1) maintain contact with and cooperate with DCFS, (2) successfully complete substance abuse treatment, (3) undergo monthly toxicology screenings, (4) participate in and successfully complete counseling, and (5) successfully complete a domestic violence perpetrator course. The evidence established that during the relevant periods, respondent failed to engage in substance abuse treatment and continuously denied that she had a substance abuse problem. She also failed to undergo any toxicology screenings during the relevant periods, never completed a domestic violence perpetrator course, and failed to engage in counseling.

¶ 58          Even more troubling than respondent's failure to complete many of her required services was respondent's attitude toward them. Respondent reported to Osgood that she did not need any of the services and "hadn't learned anything" from the services she completed.

> "The point of requiring parents to attend classes and engage in services is not just so the parents can say they attended; it is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care." (Emphasis in original.) *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56.

Because respondent claimed to learn nothing from the services she completed, the court could presume that respondent would not apply any new skills to care for and protect her children, placing M.M. and H.M. in the same dangerous conditions that led them to be removed from her care.

¶ 59          Furthermore, while respondent completed a domestic violence victim course prior

- 18 -

to November 3, 2022, respondent continued to be involved in physically violent relationships. Officer Roberts testified that just two months before the trial court's hearing on December 5, 2024, respondent reported that her then-boyfriend grabbed her by the throat and shoved her head into the side of her house. While respondent reported that incident to police, she did so only to make a report of damage to her home. Additionally, during both relevant time periods, respondent became a perpetrator of violence herself by committing a battery against Grigsby in April 2023. Thus, respondent did not "actually chang[e] the circumstances that brought the children into care." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. Based on respondent's actions and statements, the court's finding that respondent did not make reasonable progress toward the return of M.M. and H.M. during the relevant period was not against the manifest weight of the evidence.

¶ 60                                    C. Best Interest

¶ 61        Respondent also argues that the trial court's best-interest finding was against the manifest weight of the evidence.

¶ 62        If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. Consequently, at a best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364.

¶ 63        The burden is on the State to prove by a preponderance of the evidence that termination of a parent's rights is in the best interest of the child. *D.T.*, 212 Ill. 2d at 366. When determining a minor's best interest, the trial court must consider, "in the context of the child's age

and developmental needs," the following factors:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 64    The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 65    Here, the evidence established that M.M. and H.M. had been in foster care with the same foster families for more than four years and each family wanted to adopt them. Both girls were bonded with their foster families and happy in their current placements. While M.M. and H.M. were in separate homes, they visited each other often. The evidence showed that although M.M. and H.M. appear to love respondent, they had not visited her in over a year, H.M. did not want to see respondent, and M.M.'s bond with respondent was "[l]imited" because she had never lived with respondent.

¶ 66    Respondent contends that the trial court's best-interest finding was against the manifest weight of the evidence because her mother, Tunisia, was willing and able to take custody of M.M. and H.M. However, the court properly found that taking M.M. and H.M. from the only homes they have known for four years and placing them in a new environment with someone they barely knew would not only not be in their best interest but would be traumatizing to them. The court carefully considered the best-interest factors and emphasized M.M.'s and H.M.'s needs for "stability and permanence" (see 705 ILCS 405/1-3(4.05)(g) (West 2024)), which their foster families could provide through adoption, as well as "ample credible evidence" that M.M. and H.M. feel love, attachment, and a sense of being valued by their foster families (see 705 ILCS 405/1-

3(4.05)(d)(i) (West 2024)). Based on the facts of this case, the court's determination that it was in M.M.'s and H.M.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 67                                    III. CONCLUSION

¶ 68          For the reasons stated, we affirm the trial court's judgment.

¶ 69          Affirmed.