2026 IL App (1st) 242259-U
Order filed February 13, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-24-2259

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.B., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 21 JA 695 |
| | ) | |
| v. | ) | |
| | ) | |
| A.B., | ) | Honorable |
| | ) | Jennifer J. Payne, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the orders finding the father was unfit to parent his son under grounds (b) and (m) of the Adoption Act, terminating his parental rights, and setting a goal of adoption.

¶ 2    Respondent-appellant, A.B., appeals from the orders of the circuit court which found he was unfit and terminated his parental rights as to his son, J.B. (born on July 24, 2021) and set a goal of adoption. We affirm[1].

¶ 3    The State, on July 29, 2021, filed a petition for the adjudication of wardship (petition) as to J.B., naming A.B. as his putative father and J.A. as his mother. According to the petition, J.B. was neglected due to an injurious environment and abused due to a substantial risk of physical injury pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2022)). The petition supported the claims with the following factual allegations:

"Mother has two and putative father has one prior indicated report for inadequate supervision. Mother has also been indicated for substance misuse. Parents have two other minors [K.B. and A.A.,] who are [in the Department of Children and Family Service (DCFS)] custody with findings of neglect and/or drug exposed infant having been entered. Offered and recommended reunification services are outstanding for both parents. At the time of this minor's birth parents were residing together. Paternity has not been established."

¶ 4    The State filed an affidavit from Minnie Johnson, an investigator with DCFS, which provided an evidentiary basis for the allegations in the petition. The State also filed a petition for temporary custody of J.B.

---

[1] This case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which requires the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Due to extensions of time granted to counsel, we find good cause exists for filing this decision beyond the deadline.

¶ 5 On July 29, the court entered orders granting the motion for temporary custody of J.B., appointing the Cook County Guardian as J.B.'s attorney and guardian *ad litem* (GAL), and granting A.B. supervised day visitations. In a later order, the court found A.B. to be the father of J.B. (paternity order).

¶ 6 The State subsequently withdrew the claim in the petition that J.B. was abused due to a substantial risk of injury. On December 21, 2021, the court held an adjudication hearing on the remaining claim of neglect premised on an injurious environment. The parties stipulated to the facts. According to the stipulation, Mecole Watkins, a DCFS investigator, would testify that in March 2019, A.B. and J.A. were both indicated on an investigation after their son, K.B., was found alone at two years of age. J.A. also was indicated when their son, A.A., tested positive for PCP after his birth in February 2020. Watkins took protective custody of J.B. based on the parents' indicated reports and their continuing need to complete the services which were required based on the open cases involving K.B. and A.A. Additionally, Dajanese Turner, the Director of Child Link, the agency charged with monitoring the case, would testify that at the time of J.B.'s birth, A.B. had been referred for domestic violence classes as a perpetrator, was inconsistent with random urine drops which had been recommended based on his history of PCP use, and had supervised visits only with K.B. and A.A. In an adjudication order, the court found that J.B. was neglected based on an injurious environment (adjudication order).

¶ 7 In a disposition order entered on February 9, 2022, the court adjudged J.B. a ward of the court (disposition order). The court found that A.B. was unable to care for, protect, train or discipline J.B., reasonable efforts had been provided to make reunification possible but were unsuccessful, and it was in J.B.'s best interest that he be removed from his custody.

¶ 8    On August 29, 2022, the court entered a permanency order which stated that services were ongoing, A.B. had not made substantial progress and continued to test positive for illegal substances, and J.B. had been placed in a traditional foster home. The court set a goal of return home pending status hearing.

¶ 9    The court, in an April 12, 2023, order, changed the permanency goal to substitute care pending court determination on termination of parental rights (TPR) as this goal was now in the best interest of J.B. The order included findings that A.B. did visit with J.B. and had made reasonable efforts but failed to make real progress toward reunification. The foster parent had cared for J.B. for one year and was willing to adopt him and provide him with permanency. In later orders of October 27, 2023, and April 29, 2024, the court again set the same goal, TPR, as being in J.B.'s best interest in that he had bonded with the foster parent, who still was willing to adopt him and A.B. had not made substantial progress in services.

¶ 10    Subsequently, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. The supplemental petition alleged that A.B. had failed to maintain a reasonable degree of interest, concern or responsibility as to J.B.'s welfare (ground (b)) and failed to make reasonable efforts to correct the conditions which were the basis for J.B.'s removal within any nine-month period after the December 1, 2021, adjudication of neglect or abuse (ground (m)) in violation of sections 1(D)(b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), 1(D)(m) (West 2022); 705 ILCS 405/2-29 (West 2022). In a later pleading, the State defined the nine-month periods for its ground (m) claim as December 2, 2021, through September 2, 2022, September 3, 2022, through June 3, 2023, and May 16, 2023, through February 16, 2024 (ground (m) pleading).

¶ 11    The fitness portion of the termination hearing proceeded on September 23 and 25, 2024. At the outset of the hearing, at the request of the State, the court took judicial notice of the adjudication, disposition, and paternity orders and the State's supplemental petition and ground (m) pleading. Further, at the request of the State and without objection the court admitted into evidence certified and delegated records which included A.B.'s records from Healthcare Alternative Systems (HAS), PCC Community Wellness and Center (PCC), the Center for Advancing Domestic Peace (CADP) and Treatment Alternatives for Safe Communities (TASC).

¶ 12    The HAS records were dated from 2021 to 2024 and related to services for anger management/domestic violence and substance abuse.

¶ 13    In a screening report dated October 5, 2021, A.B. asserted that he was referred to HAS because his partner had drugs in her system and their child tested positive for drugs. He denied any domestic abuse on his part. He described himself as a great father and that "it takes a lot to get me angry." He would like "to have [DCFS] out of his life."

¶ 14    Notes from February 16, 2022, state that HAS learned from a DCFS caseworker that A.B. had a history of PCP use and had been discharged from Gateway for noncompliance with treatment and falsifying drug screenings. In a February 2022 assessment, A.B. said that Gateway discharged him for having "too much juice and milk" in his urine. He tested positive for PCP at the time of the assessment. He missed domestic violence classes, came to classes late and did not participate fully. On March 30, 2022, he was discharged from domestic violence classes for poor attendance. On April 20, 2022, DCFS informed HAS that A.B. had "produced a fake certificate reporting that he has completed [domestic violence] classes."

¶ 15    At a May 31, 2022, screening at a HAS inpatient facility, A.B. reported using PCP in the past beginning at age 13 and that he stopped using PCP on May 17, 2022. The screener described

him as anxious with his legs shaking throughout the assessment. He had mild/moderate memory loss and concentration issues. A.B. tested positive for PCP. He was diagnosed with "Substance Use Disorder, PCP-Severe." He remained at the facility until June 13, 2022, when he was transferred to an intensive outpatient program. The discharge notes provided that A.B. tested positive for PCP on that date but the "life expectancy of testing positive could last as long as 4 weeks."

¶ 16    An intake assessment report for an anger management program dated January 25, 2024, showed that A.B. reported that he was no longer using PCP. He stated that his most problematic outburst of anger was at a caseworker during his visit with K.B. at a hospital where K.B. was an inpatient. A.B. tested positive for PCP according to a February 26, 2024, session report. In the notes from that date, he said he had not used the drug "in a year" and did not know what triggered him to smoke PCP at that time. He did not think his drug use was a problem. A February 28, 2024, session note stated that because A.B. was having withdrawal symptoms, he was referred to a higher level of care for "medically managed detox" as he was likely to experience acute withdrawal symptoms. A second record from February 28, 2024, included a recommendation that A.B. pursue inpatient treatment for his PCP use.

¶ 17    The PCC records date from 2019 to May 2024 and indicated the initial treatment goal was for A.B. to achieve reunification with one of his children who was residing in Minnesota and the subsequent goal was for his reunification with all of his children. A.B. received behavioral health counseling services from a licensed social worker by telehealth. He had a diagnosis of adjustment disorder with disturbance of conduct based on his "[r]eported impatience, poor tolerance for frustration, anxious mood, impulsivity and impaired judgment" with a note that he abused PCP. A history section of the records stated that A.B. began using alcohol and marijuana at age 16 and

PCP at age 13. He reported last using PCP in September 2022. The records included positive drug tests for PCP. There was a notation about positive results "possibly due to false positives from taking benadryl and/or ibuprofen."

¶ 18     The CADP records showed that A.B. underwent an intake interview on January 27, 2023, and was accepted into the anger management program. The monthly reports showed he failed to attend three out of five group sessions in March, three out of four group sessions in April, four out of five group sessions in May, one out of five group sessions in August, two out of four group sessions in September, and two out of four group sessions in October. He attended no group sessions in June and July. He did attend all five group sessions in November, and all four group sessions in December. At that point he was required to attend eight more group sessions in order to complete the program which he did by attending all five group sessions in January and two group sessions in February and one meeting in March of 2024. The completion of the sessions occurred 13 months after his intake interview.

¶ 19     The TASC records included test results showing A.B. tested positive for PCP (December 5 and 28, 2023, and February 27, March 8 and 26, and April 3, 2024) and negative for PCP but positive for cannabinoids (October 31 and November 6, 2023, and January 3 and 8, 2024).

¶ 20     During the hearing, the court admitted service plans into evidence at the request of the State.

¶ 21     The service plan dated January 20, 2022, (January 2022 service plan) explained that A.B. first came to the attention of DCFS in 2019, when there were reports that K.B. (date of birth July 4, 2016) had been left alone in the family apartment or left in the hallway screaming. Additionally, A.A. was born on February 12, 2020, with PCP in his system. As a result, K.B. and A.A. were in the care of DCFS. Subsequently, J.B. was placed in a traditional foster home. The plan rated A.B.'s

progress in services as satisfactory as he was participating and making progress in the recommended services. The plan also indicated that A.B. "does not respect the rules of the recommended agency."

¶ 22    The service plan dated November 10, 2022, (November 2022 service plan) stated that A.B. had not made significant progress in services and failed to successfully complete the referred services. Although he completed parent coaching in 2021, he needed to reengage in parenting education "to understand how his addiction can impact the care of the minors." His substance abuse counselor reported that A.B. "was continuously testing positive for PCP" and that he may be discharged and referred to a more intensive inpatient treatment facility. He had also been "inconsistent in drops." A.B. maintained that "he is still testing positive because he is taking Ibuprofen and Benadryl." A.B. "struggles to respect most boundaries" and becomes verbally aggressive with the caseworker when discussing why he does not have his children in his care. He had not "made efforts to engage with the agency as of 8/01/22."

¶ 23    The service plan dated February 17, 2023, (February 2023 service plan) reported that A.B. has tested positive for PCP and has struggled with maintaining his sobriety for years. He has not completed any of the referred services. He was rated unsatisfactory in drug testing and needed to reengage in domestic violence (perpetrator) and substance abuse treatment, individual therapy, Narcotics Anonymous (NA) and identify a sponsor.

¶ 24    The service plan dated August 21, 2023, (August 2023 service plan) indicated that as of February, A.B. had outstanding services: anger management, individual therapy, NA (including the identification of an NA sponsor), and domestic violence (perpetrator) treatment. Additionally, he was inconsistent with his drug testing for three to six months and had a positive test for PCP in February. He was discharged from HAS intensive outpatient treatment in February 2023 but was

to participate in the continuing care program. The service plan stated that A.B. "has not put forth sincere efforts toward completing the referred services." He was rated unsatisfactory for services. A.B. had not provided the caseworker with a current address and has been verbally aggressive with the caseworker.

¶ 25    The service plan dated February 21, 2024, (February 2024 service plan) revealed that on October 27, 2023, the court changed the permanency goal for K.B. and A.A. from private guardianship to return home because there were no family members or traditional foster homes "willing to care for the minors with their behavior problems." Beginning in September 2023, K.B. was hospitalized for several months to address his aggressive behavior. During a visit with K.B. at the hospital in December 2023, A.B. was under the influence of PCP and as a result, A.B.'s visitations with J.B. and his siblings were cancelled. J.A. was pregnant and the baby was due in February 2024.

¶ 26    Because of the goal change for K.B. and A.A., A.B., again, was referred to recommended services. A.B. was referred to HAS for substance abuse treatment but he tested positive for PCP at his intake assessment. The service plan indicated that A.B. desires reunification with his children but "has not put forth sincere efforts towards completing the referred services." He has been unemployed since early 2022 and lacks the financial stability which is needed to care for his children if they are returned home. A.B. was rated unsatisfactory in substance abuse services, individual therapy, anger management, and maintaining sober living and had failed to test negative for three consecutive months. The plan noted that he "has [relapsed] in his dependency on PCP." Additionally, J.A. reported that A.B. "stole her SSI money" and "kicked her out from his home knowing she was pregnant."

¶ 27    Michael McKay, a supervisor with Child Link; Elisa Martinez, a caseworker with Child Link; and A.B. testified at the hearing as to fitness.

¶ 28    McKay supervised the case involving A.B. beginning in September of 2020 through July 2023. The matter began before the birth of J.B. due to prior indicated reports involving substance abuse against A.B. and J.A.

¶ 29    McKay testified that under the January 2022 service plan, A.B. was to participate in certain services: domestic violence, individual therapy, parenting classes, substance treatment, anger management, and random urine drops. During the time period of this service plan, A.B. was referred both for domestic violence services and outpatient substance abuse treatment but he had not completed them. He was also referred for individual therapy and was making progress with some setbacks, parenting classes which he attended and for anger management which he did not finish. He failed to appear at many of the random drug test appointments and when he did appear, most of the times he tested positive for PCP and sometimes for marijuana. A.B. had been informed that a failure to appear for a drug test would be considered a failed result.

¶ 30    McKay next addressed the November 2022 service plan. During the time frame of this service plan (February to November 2022), A.B. completed parenting classes and individual therapy but had not finished domestic violence services and substance abuse treatment. A.B. was rated unsatisfactory in this service plan. In the February 2023 service plan (covering November 2022 to February 2023), A.B. also was rated unsatisfactory as he had not completed substance abuse and anger management treatments.

¶ 31    During the time period covered by the August 2023 service plan, February to August 2023, A.B. had completed individual therapy and parenting classes. He still needed to finish anger

management and domestic violence services and substance abuse treatment. He was rated unsatisfactory for services.

¶ 32   Under each of these service plans, A.B.'s supervised visitation participation was consistent and appropriate and he was granted additional supervised visits under the August 2023 service plan. However, the agency never recommended that A.B. have unsupervised visits with J.B. because he had not addressed his substance abuse issues. Throughout the time McKay supervised the case, A.B. continued to test positive for illegal substances. McKay had an understanding that the use of over-the-counter drugs may result in a positive drug result but he did not have knowledge that over-the-counter drugs could result in a positive PCP result.

¶ 33   In April 2023, after a meeting, McKay and the caseworker agreed to a recommendation of a goal change to TPR. There had been no "positive momentum" from the parents. Throughout McKay's time supervising the case, A.B. continued to test positive for illegal drugs despite three referrals to outpatient drug treatment. A.B.'s positive drug assessments indicated that he needed further treatment.

¶ 34   Martinez was assigned to the case in September 2023 and was the author of the February 2024 service plan.

¶ 35   Martinez testified that after the court ordered that both parents be referred again for all services, A.B. did not fulfill the re-referrals for parenting classes, anger management, and substance abuse services during this time period. He did complete the re-referral for domestic violence treatment in January 2024. Based on a TASC assessment, A.B. was referred to Westcare for substance abuse treatment. A.B. declined to sign a release so Martinez could not obtain his records. His counsel sent Martinez documents pertaining to his treatment at Westcare. Martinez referred A.B. to HAS for individual therapy in March 2024 but he refused to follow-up with this

11

referral, saying he was receiving therapy at another location. Martinez, on cross-examination by A.B.'s counsel, testified that she had not seen a letter dated April 26, 2024, showing A.B. had successfully completed anger management and she did not remember a report from A.B.'s counsel showing he completed substance abuse treatment at Westcare.

¶ 36    During this time period, A.B. was first allowed monthly supervised visits with J.B. and participated in two out of three visitation opportunities. However, since December 2023, because of the incident during the hospital visit with K.B., A.B. has been prohibited from visitations with his children until he passed three successive drug tests. At the time of the hearing, he was still prohibited from visitations. A.B. has asked that his visitations be resumed. In the February 2024 plan, A.B. was rated unsatisfactory for visits and he did not attain unsupervised visits.

¶ 37    A.B. testified that although he has not visited with J.B. since October 2023, he has asked to do so. He desires to achieve reunification. He maintained that he signed releases for his substance abuse treatment with Westcare and completed the treatment. He also completed anger management and domestic violence services in January 2024 and provided Child Link with proof. Although he tested positive for PCP in February, March, and April 2024, he has since "been giving clean urine drops."

¶ 38    At the conclusion of the fitness hearing, the court made oral observations and findings. The court noted that A.B. showed interest and concern for J.B. throughout the case. However, he had not demonstrated responsibility for J.B. in that he has never achieved unsupervised visitations or sustained sobriety and has continued to test positive for PCP, an hallucinogenic which can cause unpredictable behavior. His behavior at the hospital visit with K.B. was explosive and placed a caseworker in fear. The court found that the State had proven A.B.'s lack of responsibility under

ground (b) and failure to correct the conditions which caused his separation from J.B. and make reasonable progress within the three ground (m) periods of time by clear and convincing evidence.

¶ 39    The best interest portion of the termination hearing was held on October 21, 2024, where the witnesses were Martinez and the foster mother, S.G. (foster mother).

¶ 40    Martinez testified that J.B. has been in a traditional foster home since just after his birth in 2021. The foster parents, their two older children (ages 17 and 23), and J.B.'s younger sibling (age seven months) also live in the home. Martinez has routinely visited the foster home and found it safe and without signs of abuse, neglect, or corporal punishment. J.B. attends preschool, is up to date with his medical, dental, vision and hearing appointments, and participates in occupational and speech therapies. J.B. is bonded with the foster parents and is close to his younger sibling and the children of the foster parents. The foster parents engage in activities with J.B. and are eager to adopt him.

¶ 41    The foster parents have provided J.B. with opportunities to visit with K.B. and A.A. and are open to continuing those visits should they adopt J.B. The foster mother would arrange for video calls between A.B. and J.B. if adoption occurs.

¶ 42    Martinez testified that Child Link was recommending that A.B.'s parental rights be terminated for several reasons. J.B. has been with the foster family since his birth and he and the foster parents have developed a "very deep emotional and loving attachment to one another." The foster parents have demonstrated a willingness to adopt J.B. and provide him with permanency, a safe and caring environment and a stable and loving home. Child Link concluded that termination of parental rights and a goal of adoption would be in J.B.'s best interest.

¶ 43    The foster mother testified that she, the foster father, and their children have developed a bond with J.B. and have a great relationship. They attend church and school activities together.

The foster mother has helped J.B. with his verbal skills, occupational therapy, and his individualized education program. She feels capable of advocating for him as to his therapy and educational needs. The foster parents want to adopt J.B. because they love him, are bonded and "wouldn't want him to be anywhere else but here with us." The foster mother agreed that adoption would be in the best interest of J.B.

¶ 44 The court orally found that the foster home was safe and appropriate and it was in J.B.'s best interest to terminate parental rights and to appoint a guardian with the right to consent to adoption. The court noted that J.B. has bonded with the foster parents and has been in their home since he was days old. J.B.'s younger sibling resides in the foster home. The foster parents wish to adopt J.B. and would allow continued relationships with his older siblings and contact with A.B.

¶ 45 On October 21, 2024, the court entered an order finding that A.B. failed to maintain a reasonable degree of interest, concern or responsibility as to J.B.'s welfare (ground (b)) and failed to make reasonable efforts to correct the conditions which were the basis for his removal and make reasonable progress towards the goal of reunification (ground (m)). The court further found that it was in J.B.'s best interest that A.B.'s parental rights be terminated and it set a goal of adoption. A.B. has appealed.

¶ 46 On appeal, A.B. argues that the State failed to prove by clear and convincing evidence that he was unfit under both grounds (b) and (m) and therefore the circuit court erred in terminating his parental rights as to J.B. A.B. has not raised errors as to the best interest portion of the termination hearing.

¶ 47 " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). "Illinois policy

'favors parents' superior right to the custody of their own children.' " *Id.* (quoting *In re E.B.*, 231 Ill. 2d at 464).

¶ 48    The Juvenile Court Act provides a two-step process to involuntarily terminate a parent's rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). After a finding of parental unfitness, the court determines whether it is in the minor's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 49    The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence." *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.* A reviewing court may not substitute its judgment for that of the trial court regarding credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 50    The supplemental petition alleged that A.B. was unfit under sections 1(D)(b) and (m). 750 ILCS 50/1(D)(b), (m) (West 2022). The circuit court found that the State had met its burden of showing A.B. was unfit on both grounds.

¶ 51    We first review the trial court's finding that A.B. was unfit pursuant to section 1(D)(b) of the Adoption Act for his failure to maintain a reasonable degree of interest, concern, or

responsibility as to J.B.'s welfare. *Id.* § 1(D)(b). We may consider any of the three elements on its own as a sufficient basis for unfitness, due to the disjunctive language of section 1(D)(b). *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 49. A finding of unfitness under ground (b) is based on a subjective analysis. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Ground (b) does not focus on the parent's success but, rather, the reasonableness of his or her efforts and takes into account the parent's difficulties and circumstances. *Id.* However, a parent is not fit simply because he has shown some interest in or affection for the children. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. Rather, the interest, concern, and responsibility must be objectively reasonable. *Id.* " '[N]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b).' " *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24 (quoting *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Unlike ground (m), ground (b) has no time constraint that limits our consideration of respondent's fitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50.

¶ 52    The circuit court found that although A.B. had shown interest in and concern for J.B. throughout the case, he had not demonstrated responsibility for J.B. in that he never achieved unsupervised visitations, did not sustain his sobriety, and continued to test positive for PCP. This finding was supported by the testimony of McKay that A.B. often failed to appear for his drug tests despite knowing that his failure to take a test would be considered as a positive drug result. Additionally, when he did take the drug tests, he continued to test positive for PCP despite multiple referrals for drug treatment. A.B.'s HAS, TASC and PCC records included positive test results for PCP. The service plans also demonstrated that A.B. was inconsistent in taking his drug tests and continued to test positive for PCP. Child Link never recommended that A.B. have unsupervised

visits with J.B. because A.B. had not addressed his substance abuse issues. In December 2023, A.B.'s supervised visits with J.B. were suspended after he visited K.B. at the hospital while under the influence of PCP and caused a disturbance. To regain visitations, A.B. was required to have three successive negative drug tests; supervised visitations had not been reinstated at the time of the fitness hearing.

¶ 53    Additionally, all of the admitted service plans showed that A.B. had outstanding recommended services which were necessary to achieve reunification with J.B. Some plans rated A.B. unsatisfactory as to progress in services and indicated that A.B. failed to follow the case management rules and behaved aggressively towards caseworkers.

¶ 54    A.B. argues that the circuit court's ground (b) finding was against the manifest weight of the evidence where he testified that he tested negative from April 2024 through the dates when the termination hearing began, September 23 and 25, 2024, and that no one testified that he was "presently a danger or risk to J.B. because of his history of addiction." A.B.'s testimony as to negative test results is not corroborated and is inconsistent with the testimony that at the time of the termination hearing his visitations with J.B. had not been reinstated due to his failure to pass three successive drug tests. A.B.'s argument also ignores that his drug addiction did harm J.B. as his addiction led to the suspension of supervised visitation and prevented him from achieving unsupervised visitation. Finally, A.B.'s argument about negative drug tests beginning in April 2024 until the termination hearing in September 2024 ignores that by that time J.B. had been in the care of DCFS for three years and that the goal had been changed to TPR in April 2023.

¶ 55    We conclude that the court's ground (b) finding was not against the manifest weight of the evidence.

¶ 56    "[S]ection 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." (Emphasis in original.) *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001).

¶ 57    "The reasonable efforts inquiry is a subjective one, focusing on the efforts of the parent that would be reasonable for that parent under the circumstances." *In re J.O.*, 2021 IL App (3d) 210248, ¶ 51. "The inquiry is narrow, as it considers only the correction of those conditions originally providing the basis for removal of the children." *Id.*

¶ 58    Failure to make reasonable progress toward the return of the child is judged on an objective standard, focusing on the steps the parent has taken toward reunification. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)). Reasonable progress is made if the court can conclude that it will be able to order the minor returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). At a minimum, the parent must make demonstrable movement toward the goal of returning the child home. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Failure to comply with an imposed service plan and infrequent or irregular visitation with the minor may support a finding of unfitness under ground (m). *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 59    Termination under section 1(D)(m) contains a time frame limitation (750 ILCS 50/1(D)(m) (West 2022)), and thus in this section, we narrow our examination of respondent's progress towards reunification, including aspects such as his service plan and regularity of visitation, to the nine-month periods set forth by the State. Here, the circuit court found that the State had established A.B.'s lack of reasonable progress for each of the nine-month periods set forth in the

ground (m) pleading. We may affirm this finding on the basis of a lack of reasonable progress in any of the nine-month periods. *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 59.

¶ 60    During the nine-month periods of the ground (m) pleading, the pertinent service plans showed that A.B. had not completed all of the services which were recommended as necessary to achieve reunification with J.B. He continued to test positive for PCP despite several referrals to substance abuse treatment. When he was allowed supervised visitations, A.B. was consistent and appropriate with supervised visitations. However, during the pendency of the case, he was never allowed unsupervised visitations and as discussed, in December 2023, his supervised visitations were suspended and they remained suspended at the time of the termination hearing, nine months later. The evidence showed that A.B. had not made demonstrable progress toward reunification with J.B. Since days after his birth,  J.B. was under the care of Child Link and in his foster home and the evidence showed that four years later, a return home could not be accomplished in the near future.

¶ 61    The circuit court's ground (m) finding was not against the manifest weight of the evidence.

¶ 62    As noted, A.B. has not raised errors as to the best interest hearing and has not challenged the circuit court's best interest finding. Accordingly, he has forfeited any argument that the circuit court's best interest ruling was against the manifest weight of the evidence or that the goal of adoption was an abuse of discretion. See *In re D.P.*, 2024 IL (1st) 231530, ¶ 28 (citing *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26; Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.")).

¶ 63    We also note that A.B. cursorily contends toward the end of his appellant's brief that his procedural due process rights were violated in this case. A.B. does not elaborate on how his

constitutional rights were so violated, nor does he cite relevant case law in support thereof. The issue is forfeited. *Id.*

¶ 64     For these reasons, we affirm the orders of the circuit court which found that A.B. was unfit to parent J.B., terminated A.B.'s parental rights, and found the goal of adoption was in J.B.'s best interest.

¶ 65     Affirmed.